Nicole and Brad DAVIS, individuals; Kent Player, an individual; Matt Arnett, an individual; Rick Taylor, an individual; Jan Sharp, an individual; and Dennis Dalley, an individual, Plaintiffs,

v.

Rodney E. SLATER, Secretary, Department of Transportation; Kenneth C. Wykle, Administrator, Federal Highway Administration; David Gibbs, Division Administrator, Federal Highway Administration, Utah Division; and Thomas R. Warne, Executive Director, Utah Department of Transportation, Defendants.

No. 2:00–CV–0993C.

United States District Court,
D. Utah,
Central Division.

July 2, 2001.

Jeffrey W. Appel, James L. Warlaumont, Jennifer Lupton Crane, Appel & Warlaumont, Salt Lake CIty, UT, for Plaintiffs.

Stephen L. Roth, U.S. Atty. Office, Clay Samford, U.S. Dept. of Justice, Washington, DC, James R. Soper, Steven F. Alder, Thomas A. Mitchell, Utah Atty. Gens. Office, Salt Lake City, UT, for Defendants.

## ORDER

CAMPBELL, District Judge.

This matter is before the court on Plaintiffs' motion for preliminary injunction. The court held a hearing on the matter on May 24, 2001. Plaintiffs seek declaratory and injunctive relief, barring further road construction by State of Utah Defendants, and challenging the decision of the Secretary of the Department of Transportation to allow highway construction after performing an Environmental Assessment ("EA") and issuing a Finding of No Significant Impact ("FONSI") for a highway project. Except for the brief background section below, the facts are set forth in the parties' pleadings and will not be repeated except as necessary to explain the court's

decision. For the reasons set forth below, Plaintiff's motion is DENIED.

### Background

This civil action involves agency approval of a highway project (the "Project") located in the vicinity of 11400 South Street between State Street and Interstate 15 ("I–15"). The project itself involves several different components: a new freeway interchange, a new bridge and highway through the Jordan River Parkway and over the Jordan River, as well as other road and highway improvements. The project proponents are the Utah Department of Transportation ("UDOT"), and the cities of Draper, Sandy and South Jordan (the "Cities"); the federal agency responsible for approving the project is the Federal Highway Administration ("FHWA"). If the project goes forward, UDOT will be responsible for the construction, for which the Utah Legislature has appropriated twenty-six million dollars. In addition to those monies, approximately three million dollars in federal funds has been designated for improvements to the 11400 South/ State Street interchange.

The history of the project is fairly straightforward for a highway approval process. It began when the Cities decided that they wanted an interchange on I–15 at 11400 South; the Cities petitioned the legislature for money for the project— which the legislature approved—and UDOT agreed to use its best efforts to build it. Defendants[1] contend that there are several reasons why the Project is necessary, primarily traffic congestion and projected growth in the area. Interstate 15 ("I–15"), which provides the north-south route through the area, suffers from con-

gestion, which is partially exacerbated by the current partial interchange at State Street. The Defendants also suggest that the State Street interchange has substandard "geometry" (highway constructor's jargon for "configuration"), causing further congestion in the area, and that the State Street interchange is placed too close to the interchange at I–15 and 12300 South— which they contend causes dangerous weaving on I–15 and traffic "backup" on the ramp at 12300 South. Defendants further contend that east-west travel in the area is complicated by the fact that the only major east-west routes that allow access to I–15 are 10600 South and 12300 South. Area traffic attempting to cross the Jordan River in the area is funneled onto 10600 South or 12300 South, creating more congestion on both streets, and causing those motorists in the 11400 South area to access those streets if they want to cross the river. Traffic modeling[2] included in the administrative record concludes that 10600 South and 12300 South as they presently exist cannot meet the projected growth of travel demand in the area. To meet these projected demands, the cities proposed the 11400 South corridor as a third major east-west route. The details of this expansion, as mentioned above, includes the completion of a one mile segment between 700 West and 1300 West across the Jordan River, and construction of an interchange where 11400 South intersects I–15. Aside from the gap between 700 West and 1300 West, 11400 South runs continuously from 2000 East in Sandy to the Bangerter Highway in South Jordan.

The review of the Project required by the National Environmental Policy Act

---

1. Unless specifically noted, "Defendants" refers collectively to both State and Federal Defendants.

2. "Modeling," a somewhat confusing and overused word in this matter, refers to the

process whereby the agency uses data and/or projections to evaluate the status of something, or project the probable impacts of a given occurrence or designed structure.

("NEPA") and Section 4(f) of the Transportation Act ("4(f)") was initiated in December of 1998. NEPA, 42 U.S.C. § 4321 *et seq.,* and Section 4(f) of the Transportation Act, 49 U.S.C. § 303(c), require the Secretary of Transportation to conduct an analysis of proposed highway projects that may have environmental effects on an area in general and effects on public parklands and historic sites. At the conclusion of the review process, the FHWA published an EA/4(f) document, and issued a FONSI on October 13, 2000.

Plaintiffs are residents of the area encompassed by and close to the project. They allege that Defendants failed to comply with NEPA and § 4(f) as well as the statutes' implementing regulations by issuing a FONSI based on what they allege is an inadequate EA/4(f) Statement. As a consequence, Plaintiffs seek relief under the Administrative Procedure Act, 5 U.S.C. § 702. Plaintiffs allege that Federal Defendants erroneously approved the project even though the EA/4(f) itself

> makes clear that: 1) the project will have known direct and indirect impacts, as well as unknown, undisclosed and unquantified impacts on the natural and human environment; 2) there are other closely related transportation projects in the vicinity that, along with the project, will contribute to direct, indirect and cumulative impacts on the natural and human environment and that have not been, but must be analyzed in a single Environmental Impact Statement ("EIS") of more regional scope; 3) there are reasonable alternatives to all or portions of the project that have been improperly and unlawfully "eliminated" or ignored by the Defendants; and 4) Defendants have failed to demonstrate that no feasible and prudent alternatives exist to the project, and have failed to utilize all possible planning to minimize harm to parkways and historic proper-

ties that will be adversely impacted by the project.

(Pl's Mem. in Supp. of Prelim. Inj. at 3.) In sum, Plaintiffs assert that the Project merited a full EIS, that Defendants erred in relying on an insufficient EA in making a FONSI determination, and that the Project's construction should be enjoined until and adequate environmental document has been produced.

## Analysis

### A. Standard for Preliminary Injunction

To obtain a preliminary injunction, the moving party bears the burden of showing: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Federal Lands Legal Consortium v. United States,* 195 F.3d 1190, 1194 (10th Cir. 1999). The Tenth Circuit has also adopted a modified requirement as to the likelihood of success element: "If the movant has established the other three requirements for a preliminary injunction (requirements (2), (3), and (4) above), the movant may satisfy requirement (1) by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Id.* citing *Walmer v. United States Dep't of Defense,* 52 F.3d 851, 854 (10th Cir.1995).

#### 1. Substantial Likelihood of Success on the Merits

##### a. Scope of NEPA/4(f) Review

As a threshold matter, it should be noted that judicial review of federal agency actions under NEPA and § 4(f) is accom-

plished through the Administrative Procedures Act, 5 U.S.C. § 706 et. seq. ("APA"), and is limited to the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir.1997). Neither NEPA nor the Department of Transportation Act provide an independent cause of action, and this action therefore falls under the aegis of the APA. *See, e.g. Lujan v. National Wildlife Federation*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (reviewing alleged NEPA violation under the APA); *Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (reviewing alleged violation of § 4(f) under APA).

The APA provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). According to the Tenth Circuit:

> An agency decision will be considered arbitrary and capricious if "the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir.1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

 Plaintiffs have the burden of proving that the agency's decision was arbitrary and capricious. *See Committee to Preserve Boomer Lake v. Department of Transp.*, 4 F.3d 1543, 1555 (10th Cir.1993).

When reviewing an agency decision, a court's role is quite limited: a *"disagreement ... in the methodologies employed is generally not sufficient to invalidate an EA.* [Courts] should simply *determine whether the challenged method has a rational basis* and took into consideration the relevant factors." *Id.* at 1553 (emphasis added); *accord Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 ("Although the inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is *not empowered to substitute its judgment for that of the agency."*) (emphasis added); *Vermont Yankee Power Corp. v. NRDC*, 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (holding in context of NEPA review that court may not substitute its own judgement for that of the agency).

 Finally, in reviewing federal agency actions under NEPA, a court must consider whether the federal agency in question took the required "hard look" at the potential environmental consequences of its decision. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Friends of the Bow*, 124 F.3d at 1213 ("NEPA sets forth a set of action-forcing procedures that require that agencies take a *hard look* at environmental consequences.") (emphasis added). In reviewing an agency's decision, it is not necessary that all the evidence in the administrative record or, indeed, even the weight of that evidence, support the agency decision. *See Bowman Transp. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The fact that conflicting views are expressed, particularly where, as here, there is opposition to the project, does not thereby render the agency decision invalid. *See id.* It is enough that the agency considered all relevant factors

and that there is credible evidence in the record to support the decision and the proposed action. *See id.* A court is only to assess whether the agency's decision is "within the bounds of reasoned decision making." *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Once a federal agency has made a decision subject to NEPA's procedural requirements, the court must only insure that the agency has considered any environmental consequences from the proposed action; the court cannot "interject itself within the area of discretion of the executive as to the choice of action to be taken." *Id.*

### 2. Evidentiary Matters and the Scope of Record Review

■ The scope of this court's review, therefore, is limited to the administrative record before the agency when it made its decision. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir.1994) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself"). Accordingly, "[t]he reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and reach its own conclusions based on such an inquiry." *Florida Power*, 470 U.S. at 744, 105 S.Ct. 1598; *see also Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (holding validity of agency's action should "stand or fall" on the administrative record); *Southern Utah Wilderness Alliance v. Thompson*, 811 F.Supp. 635, 642 (D.Utah 1993) ("It is settled that a court's review of agency action under this [arbitrary and capricious] standard is confined to the administrative record compiled by the agency").

With regard to review of the scientific determinations on the record, courts give deference to the agency's special expertise and professional judgment. *See Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. As the Supreme Court has noted, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary view more persuasive." *Id.* The Tenth Circuit has similarly noted:

> A disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an [EA]. Courts are not in a position to decide the propriety of competing methodologies ..., but instead should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors.

*Boomer Lake*, 4 F.3d at 1553 (citations omitted). In *Olenhouse*, the Tenth Circuit made clear that the court should avoid relying on evidence outside of the administrative record. *See* 42 F.3d at 1575; *accord Southern Utah Wilderness Alliance v. Dabney*, 7 F.Supp.2d 1205, 1206 n. 1 (D.Utah 1998), *rev'd and remanded on other grounds*, 222 F.3d 819 (10th Cir.2000). The court's review must be framed by the record that was before the administrative agency, not by evidence or arguments adduced by the litigants after the fact. *See Olenhouse*, 42 F.3d at 1575; *SUWA v. Dabney*, 7 F.Supp.2d at 1206 n. 1; *see also generally* David Sive, "The Problem of the 'Record' in Judicial Review of Environmental Administrative Action," SD88 ALI–ABA 81 (1999). As Judge Posner has explained,

> [i]n such a suit the district court is a reviewing court, like this court; it does not take evidence.... Not often, anyway. An evidentiary hearing in district court may be necessary to reconstruct the agency's action or the grounds thereof, if the action and its grounds

were not set forth in a written decision ..., though an even better response might be to stay the judicial review proceeding until the agency completed the record.... But here the agency embodied its decision and reasons in a substantial document. An evidentiary hearing in the district court might appear necessary if the agency had refused to allow the introduction of probative evidence. But the appearance is misleading. The proper judicial remedy in such a case is to order the agency to hold a proper hearing—not for the court to conduct the hearing itself.... In short, only in an emergency should a reviewing court, whether a district court or any other federal court, conduct its own evidentiary hearing.

*Cronin v. United States Dept. of Agriculture,* 919 F.2d 439, 443–44 (7th Cir.1990) (citations omitted).

With regard to the evidence outside the record in this case, therefore, the court's review is limited. As discussed at the hearing on this matter, the court considers Plaintiffs experts' testimony only to aid in the determination of whether it was arbitrary or capricious for the Secretary to rely on the record before him in making his decision to issue a FONSI in this case. With regard to the lay testimony proffered by Plaintiffs, the court finds, as discussed at the hearing on this matter, that most of it is without foundation, is conclusory, and will not be considered unless mentioned specifically.

## B. Defendants' Compliance with NEPA

The principal thrust of Plaintiffs' case is that Federal Defendants arbitrarily and capriciously relied on an insufficient EA as the basis for issuing a FONSI which authorizes the construction of the Project. Plaintiffs' claim that FHWA acted arbitrarily and capriciously by failing to consider adequate alternatives, failing to assess the environmental impacts of the proposed action, and failing to address certain environmental impacts not discussed in the EA; they contend that these inadequacies made FHWA's decision to issue a FONSI arbitrary and capricious.

NEPA has two essential purposes. "First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.' Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Boomer Park,* 4 F.3d at 1554 (citations omitted). "Agencies are not, however, required 'to elevate environmental concerns over other appropriate considerations,' but, instead, are required to 'take a "hard look" at the environmental consequences before taking a major action.'" *Id.* (citation omitted). "NEPA is essentially procedural in that it does not require major federal actions to have no significant environmental impact, it only requires that the environmental impacts be considered in the decision process." *Id.*

NEPA requires federal agencies to prepare an EIS detailing the environmental impacts of every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C.A. § 4332(2)(C). Agencies typically prepare an EA to determine whether an EIS is warranted. *See* 40 C.F.R. § 1501.4(b). An EA is a "precise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a). Under FHWA regulations, an EA is to be prepared for actions which "do[ ] not clearly require the preparation of an EIS, or where the administration believes an EA would assist in determining the need for an EIS." 23 C.F.R.

§ 771.119(a). Under federal law, an EA must contain "brief discussions of the needs for the proposal, of alternatives . . ., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If the EA reveals that the proposed action is one "significantly affecting" the environment, the agency must undertake the EIS process. *See* 40 C.F.R. § 1501.4(c). On the other hand, where the agency concludes based on the EA that an EIS is not warranted, it issues a FONSI. *See* 40 C.F.R. § 1501.4(e).

The Tenth Circuit has addressed the standard to be applied in situations where, as here, an agency has prepared an EA and subsequently issued a FONSI. In *Boomer Lake*, the court held that judicial review must be deferential to the agency's decision:

> An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicate agency expertise and, accordingly, is reviewed under the deferential arbitrary and capricious standard. By challenging the FONSI, it is the [plaintiff's] burden to establish the agency's decision as arbitrary and capricious.

4 F.3d at 1555 (citations omitted). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. The final inquiry is whether the [agency's] action followed the necessary procedural requirements." *Overton Park*, 401 U.S. at 416–17, 91 S.Ct. 814. Indeed, "the Secretary's decision is entitled to a presumption of regularity. . . . But that presumption is not to shield his actions from a thorough, probing, in-depth review." *Id.* at 415, 91 S.Ct. 814. Once the court determines that the agency "took a 'hard look' at the relevant factors," the court must uphold the agen-

cy's decision unless there has been a "clear error of judgement." *Boomer Park*, 4 F.3d at 1551, 1556. Plaintiffs bear the burden of establishing that the agency's decision to issue a FONSI was arbitrary and capricious. *See id.* This burden is a heavy one, and the scope of the court's review is confined to " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851, *quoting Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

1. *The Scope of Review: Purpose and Need, the Issue of Segmentation, and the Proper Number of Alternatives*

Plaintiff's claim that the agency impermissibly segmented the project analyzed in the EA/4(f) from other projects that it should have considered jointly, and challenge the number and types of alternatives ultimately reviewed by the agency. Plaintiffs, in essence, suggest that the purpose, need and consideration of the 114000 project is both too narrow (because it excludes from consideration other possible transportation projects in the region) and too broad (because it "combine[s] several 'stand alone' construction efforts"). (Pl's Mem. in Supp. of Mot. for Prelim.Inj. at 25, 66 n. 24.)

▮▮▮ As a preliminary matter, it must be noted that, under NEPA, the decision making agency's consideration, analysis and review must correspond to an applicant's stated goals and objectives. "Agencies . . . are precluded from completely ignoring a private applicant's objectives." *Colorado Environmental Coalition v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999); *accord* Guidance Regarding NEPA Regulations, 48 Fed.Reg. 34263, 34267 (July 28, 1983). Under NEPA regulations, planning begins with an identification of

the purpose and need for a project. NEPA regulations promulgated by the Council on Environmental Quality ("CEQ") provide that an environmental document should "briefly specify the underlying purpose and need *to which the agency is responding* in proposing the alternative including the proposed action." 40 C.F.R. § 1502.13 (emphasis added). The agency must merely "take responsibility for defining the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes." *Colorado Environmental Coalition*, 185 F.3d at 1174. As with each step in the NEPA process, an agency's definition of a project's purpose and need is entitled to deference in judicial review. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C.Cir.1991), *cert. denied* 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638; *accord Associations Working for Aurora's Residential Environment v. Colorado Dept. of Transp.*, 153 F.3d 1122, 1130 (10th Cir.1998).

The court must uphold "an agency's definition of objectives so long as the objectives that the agency chooses are reasonable, and ... uphold its discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Busey*, 938 F.2d 190, 196. Further, it is entirely proper for the agency, "in defining the purpose of the project, to consider the economic goals of the project's sponsor." *City of Grapevine, Texas v. Dept. of Transp.*, 17 F.3d 1502, 1506 (D.C.Cir.1994). The "Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." *Id.; accord Louisiana Wildlife Federation, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir.1985) ("Indeed it would be bizarre if the [agency] were to ignore the purpose for which the applicant seeks a [project] and to substitute a purpose it deems more

suitable."). In sum, the function of a statement of purpose and need is to allow for the review of an appropriate scope and range of alternatives. *See Busey*, 938 F.2d at 196.

In this case, the purpose and need of the Project was initially formulated the Cities, which expressed a need for an interchange and a river crossing at 11400 South, and which ultimately submitted an Interchange Access Request ("IAR") to FHWA. (*See* Administrative Record at 07672 [the Administrative Record is cited hereinafter as "AR–"].); AR00232–424; AR00426–27; AR07673. The IAR described a need for an interchange at 11400 South to alleviate traffic congestion at the 10600 and 12300 South interchanges, allow increased mobility and access to planned commercial and residential development in the Cities, and also alleviate traffic weaving problems on I–15 caused by the State Street fly-over exchange. (*See* AR00237–38.) These needs, as well as others, such as increasing the efficiency of the 11400 South Corridor, were identified as the purposes and needs for the Project analyzed in the EA/(f). (*See* AR07705–6.)

## 2. Did the FHWA Improperly Segment the Project?

Plaintiffs did not brief the segmentation issue regarding the legal standards applicable in this case. However, Plaintiffs' objections to the Project regarding segmentation appear to be threefold: 1) that "[t]he Project [analyzed in the EA/4(f) ] and [projects at 10600, 12300, and 9800 South] are, for purposes of NEPA analysis, connected and similar actions ... and should therefore have been analyzed together in one environmental document"; 2) that the Lone Peak Parkway was contemplated as part of the Project early on, and then improperly separated from the project; and 3) that, because at the pres-

ent time only construction of the interchange is imminent, the present project is different than the Project analyzed in the EA/4(f). (Pl's Mem. in Supp. of Mot. for Prelim.Inj. at 25–26.)

 In defining the scope of a project for the purposes of preparing an environmental analysis, agencies "may not evade their responsibility under NEPA by artificially dividing a major federal action into smaller components, each without 'significant impact.'" *Coalition on Sensible Transportation (COST) v. Dole,* 826 F.2d 60, 68 (D.C.Cir.1987); *accord Ross v. FHA et al,* 162 F.3d 1046 (10th Cir.1998). Yet, the Tenth Circuit has noted that highway projects with logical termini, or boundaries, must be affirmed because the question regarding where a highway project begins and ends presents particularly unique factual problems: "Congress has not purported to apply NEPA requirements to every highway that connects with a federally-funded highway.... Because all local projects must start and end somewhere, under plaintiff's theory the entire highway network across the country cold be considered one project." *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1483 (10th Cir.1990). To determine whether a federally funded project is sufficiently independent, the Tenth Circuit's test requires a reviewing court to determine whether the project: "(1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." *Id.; accord* 23 C.F.R. § 771.111(f) (1987); *COST,* 826 F.2d 60; *Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294 (D.C.Cir.1987); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430 (5th Cir.1981); *Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976) (en banc).

With regard to the first element: "Although the procedural requirements of NEPA must be satisfied, the courts will require only the 'statutory minima,' refusing to substitute their judgment for the judgment of the administrative agencies charged with satisfying the requirements of NEPA." *Piedmont Heights,* 637 F.2d at 436, *citing Vermont Yankee,* 435 U.S. at 548, 98 S.Ct. 1197. As the Tenth Circuit clearly stated: "That a terminus is the *most* logical is not mandated by the segmentation analysis—that analysis requires only that a terminus be logical." *Village of Los Ranchos de Albuquerque,* 906 F.2d at 1483 (emphasis added). As to the second element, independent utility exists when the "project will serve a significant purpose even if a second related project is built." *COST,* 826 F.2d at 69. Similarly, courts have held that where a project will individually contribute to improving traffic conditions, it will be found to have independent utility, the third element to be considered. *See Piedmont Heights,* 637 F.2d at 436. With regard to the third element, courts have also found independent utility where a highway project will "improve traffic safety, separate through from local traffic, improve traffic capacity and level of service and limit development of abutting property." *Conservation Law Foundation v. FHA,* 827 F.Supp. 871, 879 (D.R.I.1993).

 Applying the four factors delineated by the *Village of Los Ranchos de Albuquerque* Court to the plaintiff's first objection regarding segmentation—that "[t]he Project [analyzed in the EA/4(f) ] and [projects at 10600, 12300, and 9800 South] are, for purposes of NEPA analysis, connected and similar actions ... and should therefore have been analyzed together in one environmental document"—the Project as outlined in the EA/4(f) is not improperly segmented. (Pl's Mem. in Supp. of Mot. for Prelim.Inj. at 25.) As to the first

factor, the Project on its face appears to have logical termini. The agency gave a rational explanation for bounding the Project as it did. (*See* AR07320.) Courts rarely disregard an agency's determination as to the scope of a project unless no logical basis can be found. *See, e.g., Patterson v. Exon*, 415 F.Supp. 1276 (D.Neb. 1976) (finding no logical termini where highway segment merely ended in middle of woods, with no access roads, population areas or other traffic generators nearby). In this case, it is apparent that a project to incorporate 114000 South into I–15—which has as its major components the widening of that road, adding a bridge to allow greater access on and to that road, involving an highway on-ramp for the road, and removing a redundant an inefficient present off-ramp—are logically bounded. Given the fact that the "analysis requires only that a terminus be logical," the Project satisfies this requirement. *Village of Los Ranchos de Albuquerque*, 906 F.2d at 1483. The second criterion, that the Project have substantial independent utility, is met as well. *See id.* At minimum, the Project would have independent utility in that it would foster access to I–15 in the growing area and the record demonstrates that it would lessen traffic congestion in the area. (*See* AR02684–707; 07705.) As to the third and fourth elements, Plaintiff has not argued that Project forecloses the opportunity to consider alternatives or irretrievably commit federal funds to closely related projects. Under Plaintiffs' first challenge, then, the Project is not improperly segmented.

Plaintiffs' second argument regarding improper segmentation is that, because local and state officials desired the Lone Peak Parkway to be included in the Project early on, not including Lone Peak for analysis purposes, or considering it a logical termini for the project, constituted improper segmentation. (*See* Pl.'s Mem. in Supp. of Mot for Summ.J. at 63; Ex. "M"

attached thereto.) Plaintiffs' argument regarding segmentation here also fails. Plaintiffs' assertion seems to rest on the assumption that discussion between UDOT officials and the Cities regarding the possible inclusion in the Project somehow insinuates the fact that the Secretary of Transportation and the FHWA at some time considered the contemplated Lone Peak Project part of the Project which was to receive federal funding. The record does not support such an assertion and amply demonstrates the contrary—the proposed extension, according to the record, has been and continues to be a local project unrelated to 11400 South and not requiring federal approval or environmental analysis.

The record indicates that City officials and members of the public wanted to have the Lone Peak Parkway completed. (*See, e.g.,* AR03731, 03732 (statements of individuals); AR03806 (UDOT meeting with Draper City Council in which Council Member expressed desire for inclusion).) In June 2000, Draper City contacted the UDOT contractor preparing the 11400 South EA and solicited a proposal for the Lone Peak extension. (*See* AR5027C–027G.) There is no evidence in the record to indicate that the Secretary of Transportation or the FHWA considered this proposal part of the project. Indeed, Draper City's request for a proposal evidences the exact opposite of Plaintiffs' assertion; it makes clear the local nature of the project, requesting that the City wished to receive and evaluate the proposals, and that its evaluation of the proposal would "be based on measurable benefits to the city for dollars spent, rather than cost alone." *Id.* The record demonstrates that the extension of Lone Peak was a local project which was added to the design-build contract for the 11400 South Project by UDOT without the knowledge or approval of the FHWA, apparently as part of a financial arrangement between UDOT and Draper City. (*See* AR04837, 06930.) Fed-

eral Defendants contend, without citation to the record, that UDOT subsequently removed the expansion of the Loan Peak Parkway from the 11400 South contract when FHWA notified UDOT that the extension of Lone Peak was not part of the federal aid project analyzed in the EA/4(f) and had not been authorized by the FONSI. (*See* Federal Defs.' Mem. in Opp. to Pls.' Mot. for Prelim.Inj. at 31.) Whether this is indeed the case is immaterial. As discussed above, the record indicates that UDOT, the Cities, and UDOT's contractor contemplated that the Lone Peak Parkway might be a desirable inclusion to the Project, but there is no evidence proffered by the Plaintiffs that evidence that the Secretary or the FHWA ever contemplated it to be part of the Project for which the EA/4(f) and FONSI were issued.

However, Plaintiffs also contend that Lone Peak is nevertheless a local project logically connected to the federally funded project and, as such, FHWA was required to include consideration of Lone Peak's environmental impacts in FHWA's environmental analysis. Therefore, the remaining issue regarding the Lone Peak Parkway under Plaintiffs' argument is whether it is a connected or similar action whose environmental impacts must be analyzed. Nothing has been introduced into evidence suggesting that Lone Peak is a funded or planned project at the present. If, in fact, no such plans exist, then Plaintiffs are asking the FHWA to analyze a project that is not only unrelated, but is merely conceptual at this point. "However, [as discussed above,] a local project closely related physically to a federal project may be deemed independent for NEPA purposes after consideration of whether the proposed segment: (1) has

logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." *Village of Los Ranchos de Albuquerque*, 906 F.2d at 1483. As discussed above, the Project as outlined in the EA/4(f) has logical termini. Even assuming that Lone Peak were a logical terminus, FHWA is not bound to consider it so. "That a terminus is the *most* logical is not mandated by the segmentation analysis—that analysis requires only that a terminus be logical." *Id.* at 1483 (emphasis added). As also discussed above, the Project as presently bound has independent utility—decreasing congestion, expanding access to I–15, etc. In addition, the record clearly demonstrates that the Lone Peak Parkway, if constructed, would have independent utility itself. (*See* AR5027C–027G.) Finally, no evidence has been introduced to suggest that the Project as outlined in the EA/4(f) forecloses the opportunity to consider alternatives, and does not irretrievably commit federal funds for closely related projects; it has not even been alleged that Lone Peak might be considered a federally funded project. Therefore, Plaintiffs' allegation that by not including the Lone Peak Parkway as part of the Project the FHWA improperly segmented the Project in its EA/4(f) analysis fails.

On a final point regarding improper segmentation, Plaintiffs argue that because at the present time only construction of the interchange and its various fixtures—such as the storm water detention basin—is imminent, it constitutes a project that is different than the Project analyzed in the EA/4(f). On this point, Plaintiffs' segmentation argument also fails.[3] Plaintiffs had

---

**3.** This is related to the Plaintiffs' contention that Defendants failed to address the environment impacts arising from the fact that the Project's construction would occur in phases.

That the Defendants considered the Project's impacts due to the fact that it would be built in phases is amply addressed in the record

argued that the storm water detention basin adjacent to Willow Creek is different than that outlined in the EA/4(f). However, Defendants provided ample evidence at the hearing on this matter—in the form of blown up maps of the Project as conceived in the record and as it is to be implemented—that this is not the case. Plaintiffs also contend that, because the 11400 South Interchange is the only part of the Project presently funded and scheduled for construction, the Project is different than the one analyzed. Plaintiffs' contend that this fact violates NEPA and point to 40 C.F.R. § 1505.1(e) as authority for this proposition. This citation offers no support for Plaintiffs' contention. Section 1505.1(e) requires the agency to disclose the range of alternatives considered and consider all alternatives described in an EIS. *See* 40 C.F.R. § 1505.1(e). Plaintiff's have offered no authority for the proposition that phased building of an approved project violates NEPA. Plaintiffs' claim of segmentation on this point therefore also fails, and, based on the discussion above, Plaintiffs have not met there burden of proving that the FHWA acted arbitrarily and capriciously by demarcating the Project as it did.

### 3. Did the FHWA Conduct a Proper Analysis of Reasonable Alternatives?

Plaintiffs also complain that the alternatives considered by the FHWA were not sufficient. Specifically, the Plaintiffs raise three objections to the FHWA's analysis of alternatives. Plaintiffs first, largely in reliance on the opinion of their expert witness, charge that FHWA failed to adequately incorporate Transportation Demand Management ("TDM")—which includes such traffic management strategies as the promotion of alternative work schedules, and car-pool/van-pool programs—and Transportation System Management ("TSM")—which includes such management devices as signal coordination and video traffic monitoring. (*See* Pl.'s Reply Mem. in Supp. of Mot. for Prelim.Inj. at 25–27; Affidavit of Norman L. Marshall at 7, attached as Ex. H to Pl.'s Mem. in Supp. of Mot. for Prelim.Inj. [hereinafter "Marshall Aff."].) Second, Plaintiffs find fault with FHWA's consideration of Mass Transit Alternatives. (*See* Pl.'s Reply Mem. in Supp. of Mot. for Prelim.Inj. at 25–27; Marshall Aff. at 7.) Finally, Plaintiffs challenge the sufficiency of the number of alternatives studied and the depth to which they are analyzed. (*See* Pl.'s Mem. in Supp. of Mot. for Prelim.Inj. at 65.)

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action. *Colorado Environmental Coalition*, 185 F.3d at 1174 (quoting 40 C.F.R. § 1502.14). Determining the alternatives to be studied, however, "is a matter left to the agency's discretion." *SUWA v. Dabney*, 7 F.Supp.2d at 1213; *accord Vermont Yankee*, 435 U.S. at 551–52, 98 S.Ct. 1197. In reviewing the agency's action, the court must "remain mindful that an agency decision concerning which alternatives to consider is necessarily bound by a 'rule of reason and practicality.'" *Airport Neighbors Alliance, Inc. v.*

---

and demonstrates that FHWA took the requisite hard look at the phasing issue. In response to neighborhood concerns, the agency addressed traffic issues that might arise during construction as well as the impacts that construction sequencing itself might cause in order to determine if they would be signifi-

cant. Comparing these possible impacts to those envisioned in a no-build scenario, the agency, after this hard look, determined that the impacts from phasing the project would not be significant. (*See* AR02472–478; AR07963–968; AR02473–477.)

United States, 90 F.3d 426, 432 (10th Cir. 1996), *quoting Boomer Lake*, 4 F.3d at 1551. This means that the agency must set forth only those alternatives "sufficient to permit a reasoned choice." *NRDC v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972); 40 C.F.R. § 1502.1; *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1160 (9th Cir.1998). In the Tenth Circuit, "[w]e uphold an agency's discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir.1992) (quoting Busey, 938 F.2d at 196). Moreover, it is axiomatic that "[a]n agency need not analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective." *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984); *Colorado Environmental Coalition*, 185 F.3d at 1174–75.

It is also clear that an

agency's duty to consider alternatives in preparing an EA is a lower duty than the duty to consider alternatives in preparing an EIS. Compare 40 C.F.R. § 1508.9(b) (An EA need only "include brief discussions ... of alternatives."), and 40 C.F.R. § 1502.14 (In preparing an EIS, agency must "[r]igorously explore and objectively evaluate all reasonable alternatives.").

*Jackson Hole Conservation Alliance v. Babbitt*, 96 F.Supp.2d 1288, 1298 (D.Wyo. 2000). This principle has received broad acceptance and is based on the logic that the required range of alternatives diminishes as the expected impacts diminish. *See, e.g., Sierra Club v. Espy*, 38 F.3d 792, 802 (5th Cir.1994) (finding range of alternatives decreases as impacts of proposed action become "less and less substantial"); *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2nd Cir.1992); *South Car-*

*olina v. O'Leary*, 64 F.3d 892, 899 (4th Cir.1995) (stating that: "Under NEPA and the corresponding regulations, an EA must include 'brief discussions' of alternatives to the proposed agency action."). As the Fifth Circuit has observed, "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined ... will have no significant environmental effects anyway." *Sierra Club v. Espy*, 38 F.3d at 803. So long as the agency has rejected an alternative after finding that it was "too remote, speculative, or ... impractical or ineffective" in "good faith[,]" it has satisfied its duty under NEPA. *City of Aurora*, 749 F.2d at 1467.

The administrative record itself demonstrates that the agency considered many alternatives, including TDM and TSM, Mass Transit alternatives, as well a no-build and a wide array of build alternatives. As the final EA/4(f) demonstrates, FHWA considered a host of alternatives and eliminated those it found would not serve the described purpose after explaining its reasoning for doing so. (*See* AR07708–726.)

■ The record shows that the agency adequately considered TDM and TSM, both as alternatives and as factors incorporated into the Preferred Alternative. As one alternative, the agency evaluated the possibility of whether the full development of TDM/TSM strategies would reduce demand to a sufficient degree that the construction of the 11400 South Corridor would be unnecessary. (*See* AR07709.) However, the agency found that such strategies were insufficient, standing alone, because they failed to meet the need of increased traffic demand. *See id.* However, it is notable that the preferred alternative assumes full development and implementation of TDM/TSM strategies,

thereby incorporating them into the Project. (*See* AR07708–09.)

■ The record also demonstrates that FHWA considered Mass Transit alternatives. (*See* AR07708.) In doing so, it consulted Utah's Transit Authority and reviewed regional transit studies. (*See* AR00081–208; AR01013–026.) These studies and consultations apparently revealed that planned mass transit in the area was too remote and speculative to make further consideration of mass transit reasonable, and FHWA ultimately rejected the alternative because it was speculative and not viable. (*See* AR01017; AR02023–024; AR01013–026; AR01202–203; AR01674; AR07114; AR07710.) As with the TSM/TDM strategies, moreover, the agency made an attempt to incorporate foreseeable Mass Transit options by providing for wide shoulders and bus turnouts to accommodate safe bus operations in the Project area. (*See* AR07710.)

Aside from the no-build alternative, FHWA also analyzed several build alternatives, some which it incorporated into the Project. (*See* AR07941; AR07710–12.) These included: 1) building the 11400 South interchange portion of the Project and extending 11400 South across the Jordan River to Redwood Road as a three-lane road; 2) not building any of the 11400 South Project and meeting the proposed need by adding lanes to 10600 and 12300 South; 3) building the 11400 South Interchange but not extending 11400 South to Redwood Road; and 4) widening and extending 11400 South across the Jordan River but not constructing the interchange. (*See* AR07710–12; AR07941; AR07956.)

■ State Defendants during this process took particular pains to analyze the possibility of meeting travel demand without constructing a 11400 South crossing of the Jordan River. This analysis attempted "to determine whether there are viable

alternatives to meet the projected travel needs on 11400 South which would not require a 11400 South Jordan River Crossing." (AR07954.) To determine this possibility, the hired consultant modeled travel demand on six parallel roads under five different scenarios before concluding that a river crossing at the intersection was necessary to allow each corridor to operate at an acceptable level of service. (*See* AR07956–957.) UDOT also conducted a separate analysis of the feasibility of a three-lane 11400 South alternative. (*See* AR07941–943.) This study analyzed two scenarios: a three-lane 11400 South without altering any of the other improvements contained in the Wasatch Regional Front Counsel's Long Range Plan, and a three-lane 11400 South with parallel expansion of 10600 South to seven lanes. *Id.* The studies determined that under both scenarios, 11400 volume to capacity ratios exceed acceptable levels and congestion on parallel street increases. *Id.* These alternatives were therefore eliminated from consideration.

Plaintiffs at oral argument and through their expert contend that these analyses were faulty, but presented no credible evidence that the agency was arbitrary and capricious in relying on the detailed studies in the record, and outlined above. Having modeled numerous alternatives and determining that none would meet projected traffic demand, the EA/4(f) reasonably concluded that only the Project would meet the stated and demonstrated need and therefore was the only model to be carried forward for a full impacts analysis. FHWA acted reasonably and in full compliance with NEPA in eliminating alternatives that did not meet the Project's purpose prior to engaging in a full environmental analysis. NEPA does not require an environmental analysis of unreasonable alternatives. 40 C.F.R. § 1502.14(a) ("for all alternatives which were eliminated from detailed study [the environmental docu-

ment shall] briefly discuss the reasons for their having been eliminated.") *See, e.g., Tongass Conservation Society v. Cheney,* 924 F.2d 1137, 1140–42 (D.C.Cir.1991) (Ruth Bader Ginsburg, J.) (upholding EIS where thirteen of fourteen sites eliminated with only brief discussion because only one site feasible); *Laguna Greenbelt v. United States Dept. of Transp.,* 42 F.3d 517, 524 (9th Cir.1994) (noting same proposition).

There is, in sum, no showing that FHWA did not act in good faith in eliminating these alternatives from consideration before conducting its environmental analysis. Indeed, as discussed above, it fully consider these alternatives. Because the FHWA determined in good faith that these alternatives would be ineffective, it was not required to consider them in detail in the EA. *See City of Aurora,* 749 F.2d at 1467. Plaintiffs have failed to carry their burden of proving that the Secretary was arbitrary and capricious, or not acting in good faith, in rejecting alternatives that Plaintiffs would consider more desirable. Within the range of options that would achieve the Project's goals, the Secretary of Transportation considered sufficient alternatives "to permit a reasoned choice" and decided on the Project alternative. *Presidio Golf Club,* 155 F.3d at 1160. The agency evaluated various construction configurations that would meet the purpose and need addressed in the IAR and ultimately selected the option which served to meet those purpose and needs. As such, the range of alternatives considered was entirely adequate and the EA/4(f) is entirely sufficient in its analysis of alternatives.

### 4. Did the FHWA Take a "Hard Look" at the Proposal's Impacts?

Under NEPA, "[a]gencies are not … required 'to elevate environmental con-

cerns over other appropriate considerations,' but, instead, are required to 'take a "hard look" at the environmental consequences before taking a major action.'" *Boomer Park,* 4 F.3d at 1554 (citations omitted). In reviewing an environmental document and an administrative record, the court "must examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith objective presentation of those impacts sufficient to foster public participation and informed decision making." *Colorado Environmental Coalition,* 185 F.3d at 1177.

As a threshold matter, it should be noted that the record in this case is extensive indeed, containing over ten thousand pages. Much of the record is devoted to the description and analysis of the Project's possible impacts. In addition, the EA/4(f) Statement, summarizing the studies contained in the record for public review, itself contains nearly seventy pages devoted to the description of these impacts. It reveals that FHWA analyzed nineteen different types of impacts, including impacts to water quality in general (as well as those related to the project's detention basins), flood plains, farmlands, construction and phasing, induced growth, noise, historic and cultural resources, relocations, wetlands, and wildlife. (*See* AR007735–35; AR07329–31; AR07963–968; AR02684–070; AR07750–754; AR7757–788; EA/4(f) at 3–1 through 3–63.)

Plaintiffs contend that FHWA's analysis was insufficient and that the agency failed to take a hard look at the Project's impacts on water quality in general and those resulting from the Project's detention basins; flood plains; farmlands; impacts resulting from phasing; induced growth; noise; and historic resources.[4] Plaintiffs also contend

---

**4.** Plaintiffs also contend that relocations caused by the project were insufficiently ana-

lyzed. However, the record demonstrates

that FHWA improperly took mitigation measures and permitting requirements into account when they considered the Project's environmental impacts. In addition, Plaintiffs assert that the record demonstrates that the FHWA did not make an independent evaluation of the Project as required by NEPA.

### a. Were Mitigation Measures and Permitting Requirements Improperly Taken Into Account?

■■■■■■ Plaintiffs complain that Defendants improperly took mitigation measures and permitting requirements into account when they considered the environmental impact of the Project. As an initial matter, it is entirely reasonable, when evaluating the possible environmental impacts of a project, for an agency to assume necessary compliance with permitting standards regarding permits which the project must have in order to go forward. See Holy Cross, 960 F.2d at 1528–29; accord EDF v. Hoffman, 566 F.2d 1060, 1069 (8th Cir. 1977). In addition, under NEPA it is entirely proper for agencies to consider mitigation measures when they analyze the environmental impacts of a proposed project. See Park County Resource Council v. U.S. Dept. of Agriculture, 817 F.2d 609, 621–22 (10th Cir.1987), overruled on other grounds, Village of Los Ranchos de Albuquerque, 956 F.2d 970. It is also proper to take mitigation measures into account when considering whether an impact is significant. See id. "[C]onditions mitigating the environmental consequences of an action may justify an agency's decision not to prepare an environmental impact statement." Id. at 621. Moreover, mitigation

measures "need not completely compensate for adverse environmental impacts for [a] decision to forego [an] EIS to be reasonable." Id. at 621–22. Indeed, "measures implemented to mitigate potential environmental consequences are a factor to consider in reviewing an agency's decision not to prepare an EIS." Boomer Lake, 4 F.3d at 1555. All that is required in an environmental document is "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). As the Supreme Court has explained:

> There is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted on the other.... [I]t would be inconsistent with NEPA's reliance on procedural mechanism—as opposed to substantive, results based standard—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.... NEPA does not require agencies to adopt any particular decisionmaking structure.

Id. at 352–53, 109 S.Ct. 1835. Thus, it is proper for and agency to take permitting requirements and mitigation into account when considering a project's environmental impacts, and all that is required for an environmental document to be sufficient is

---

that FHWA found that relocation would be accomplished in conformance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended, 42 U.S.C §§ 4601 et. seq. (See EA/4(f) at 3–13.) Given the Utah's power of eminent domain, Utah Code Ann. §§ 78–34–1 to 20 (1996 & Supp.1999)., Utah Code Ann. §§ 78–34–1 to 20 (1996 & Supp.1999), and that the EA/4(f) provides that relocation will be accomplished in accordance with the law, FHWA took the requisite hard look at relocation impacts.

that such measures are discussed in sufficient detail.

### b. Did the FHWA take a Hard Look at Water Quality Impacts?

Plaintiffs complain that the FHWA failed to take the requisite hard look at water quality impacts, particularly storm water run-off impacts. The record reveals otherwise. FHWA determined that much of the Project area, except for one mile of new roadway, already contained roads and that therefore impacts to groundwater quality from the Project would be minimal. (*See* AR07678.) It also determined, based on mitigation measures and needed permits, that the surface water quality impacts from water off the new roadway would be minimal. (*See* AR07759.)

Specifically with regard to storm water impacts, the EA/4(f) demonstrates that storm water run-off from the Project is to be collected in curbs and gutters along the roadway, and then conveyed through a drain system to detention basins. (*See* AR07678.) The record clearly provides an explanation that storm water runoff in the storm drain system will be designed and managed according to Utah Department of Environmental Quality, Division of Water Quality permit and oversight specifications. (*See* AR07760–765.) It also demonstrates that before the Project proceeds, a Utah Pollution Discharge Elimination System permit would have to be obtained, which also requires a storm water pollution prevention plan. (*See* AR07678.) The Project also provides for other mitigation measures such as the restoration of a culvert east of 700 West, implementation of best management practices for temporary erosion and sediment control, and revegetation plan using native grasses and shrubs to curb storm water problems. (*See id;* AR07760, 765.)

As to water quality issues specifically relating to wetlands, the record is quite clear that FHWA took the requisite hard look. The record contains a lengthy jurisdictional wetlands study, which was approved by the Army Corp. of Engineers ("COE"), the federal agency with jurisdiction over wetlands. (*See* AR00766–778 and AR01809–826; AR01827.) FHWA also examined the status of wetlands adjacent to Midas Creek, Willow Creek, Jordan River, as well as others, and the impacts of the Project on these wetlands. (*See* AR07770–773.) In doing so, FHWA determined that the total wetland impacts of the project would be 0.68 acres. (*See* AR07770.) To mitigate these impacts, the Project provides for the purchase of two mitigation sites within the area, or "meander corridor," of the Jordan River, consisting of roughly ten acres. *See id.* The COE has already agreed that these mitigation measures are sufficient to offset wetland, riparian and aquatic impacts of the Project. *See id.*

It was not arbitrary and capricious to conclude that these mitigation measure would cover possible water quality impacts given that the project must comply with permitting specifications from the DWQ and the COE. The FHWA therefore took an appropriate hard look at water quality issues; it acquired the COE approval for the wetlands impacts that its study revealed, and determined that permitting and mitigation provisions would adequately address any other possible impacts, mitigating them to a level below significance.

### c. Did the FHWA take a Hard Look at Flood Plain Impacts?

The Plaintiffs also claim that FHWA failed to take a hard look at the Project's impacts on flood plains. The record reveals that the agency took a hard look at these impacts. FHWA acquired flood plane maps and flood insurance maps from the Utah State Floodplain Manager,

who also sent a letter regarding the Project's potential impact on flood plains. (*See* AR00998; AR00976–983.) The Manager's letter stated that her only concern was that the Project should be designed to avoid a hundred year flood event—the largest amount of water a flood plain might be expected to bear in a given hundred year period. (*See* AR00998.) The agency also acquired a map overlaying the project indicating where the Project would cross the hundred year flood plain. (*See* AR01413.) Given this information, the FHWA calculated how much of the flood plain would be bridged by the Project and stated that the planned bridges were designed span such a length so as to permit the passage of a hundred year flood event. (*See* AR07776–777.) As such, the FHWA took a hard look at the possible impacts of the Project on flood plains and reasonably determined that they were insignificant.

### d. Did the FHWA take a Hard Look at Impacts to Farmlands?

 FHWA concluded after study that the Project's total impact to land being farmed is 3.5 acres. (*See* AR07735.) Two separate surveys were conducted by contractors to identify farmlands, one on April 5, 1999, and another on May 11, 1999. (*See* AR01787; AR01790.) The record reveals that the study area was mapped and that the subcontractor mapping the area completed a Farmland Conversion Impact Rating Form which discussed ways that mitigation of the few affected farmlands might be achieved. (*See* AR00960; AR00958.) The subcontractor also attached a letter from the United States Department of Agriculture ("DOA"), the Agency with jurisdiction over Prime and Unique Farmlands, which noted that, for purposes of the Farmland Protection Policy Act, farmland determinations were no longer necessary for areas committed to development under local zoning. (*See* AR00957.) Nevertheless, FHWA had the

study area mapped and the proposed corridor was overlaid on a map representing pristine or important farmlands in the Project area. (*See* AR00960.) FHWA took these steps in spite of the fact that local zoning maps demonstrate that much of the affected area is zoned for non-agricultural uses and the DOA would not therefore consider these areas as protected farmland. (*See* AR07330.) In response to this in-depth analysis, the FHWA determined that farming operations along 11400 South would remain practicable. (*See* AR07119.) This demonstrates that FHWA took the requisite hard look at farmland impacts.

### e. Did the FHWA take a Hard Look at Impacts of Induced Growth?

 Under CEQ regulations, induced growth is one potential indirect effect that an agency must examine. *See* 40 C.F.R. § 1508.8(b). In the EA/4(f) statement, FHWA concluded that the total growth impact from the 11400 South Project will not be significant. The logic of this conclusion is based on the finding that development in the area has already been intense and rapid. (*See* AR07329–40.) This is supported in the record as cited, and is obvious enough that the court might take judicial notice of the fact. However, FHWA did analyze induced growth effects of the Project, concluding that, even absent the Project, growth in the area is rapid and that current zoning practices in the area suggest the same conclusion. (*See id.; see also* AR07730–31.) Based on these factors, the EA/4(f) concludes that the growth in the area will be the same with or without the presence of the Project. (*See* AR07786.) Given the expanding nature of the area, the analysis FHWA undertook, described above, satisfies the requisite hard look necessary to issue an EA and a FONSI and is in accord with the mandates of NEPA. *See, e.g., Laguna Greenbelt,* 42 F.3d at 525 (noting that in

area where growth would be certain, analysis of induced growth could take that factor into account).

### f. Did the FHWA take a Hard Look at Noise Impacts?

■ The record and the EA/4(f) also demonstrate that the FHWA took a hard look at and analyzed the potential noise impacts for the Project. The record contains a substantial report and analysis, over one hundred pages, which concludes that noise impacts from the project would be minimal. (*See* AR06931–07060.) This in itself evidences that the FHWA took a requisite hard look at noise impacts. The report uses projected year 2020 peak rush-hour traffic volumes on all sites which could be considered sensitive within roughly one thousand feet of the Project. (*See id.;* AR07745.) The study determined that there would be an impact on one hundred and nineteen sites. (*See* AR07753.) The record reveals that UDOT responded to FHWA's concerns regarding noise impacts and that UDOT provided mitigation measures, including the use of walls as noise barriers, for all but twenty-six of the sites. (*See* AR05843; AR05846.) FHWA concluded that, given that these impacts were similar to other projects in the area in which FHWA found that the impacts were insignificant, the same was so in this case, especially given the fact that noise abatement measures would be taken. (*See* EA/4(f) at 3–25 through 3–30.)

### g. Did the FHWA take a Hard Look at Impacts to Historic Resources?

■ The record also demonstrates that the FHWA took a hard look at impacts to historic properties. The § 4(f) evaluation contained in the record demonstrates that historic properties were properly identified in coordination with the Utah State Historic Preservation Officer ("SHPO"), the official responsible for determining properties eligible for listing on the national historic register. (*See* AR03925–26.) The record shows that FHWA determined measures both to preserve these properties and to mitigate any possible impacts to them. FHWA and UDOT entered into a Memorandum of Agreement with the SHPO to ensure that the impacts to the properties would be mitigated. (*See* AR07980–984.) The mitigation provisions were arrived at in consultation not only with the SHPO, but also with the Utah Heritage Foundation and the Draper Historic Preservation commission, local entities also concerned with historic properties. The mitigation plan surveyed the eligible properties, prepared a marketing plan under which the properties would be offered for sale with restrictive covenants to ensure their preservation. (*See* AR07981–82; AR05023–24.) This process evidenced in the record constitutes a requisite hard look at historic property impacts and forms the basis for a reasonable determination by FHWA that there would be no significant impacts on them.

### h. Did the FHWA and the Secretary of Make and Independent Evaluation of the Proposed Project?

■ Plaintiffs' final NEPA allegation is that FHWA and the Secretary of Transportation improperly relied on State agencies and consultants rather than making an independent environmental determination before issuing a FONSI. Plaintiffs' contention is misguided. CEQ and FHWA regulations explicitly permit project applicants to prepare environmental documentation which is then submitted to FHWA for review. *See* 40 C.F.R. § 1506.5(b); 23 C.F.R. § 771.109(c)(1). These same regulations provide that it is the role of FHWA to give guidance and commentary to the applicant and ultimately to make its own independent evaluation of the environmental document before issuing its decision. *See id.* Courts have consistently found

this type of participation by the FHWA entirely proper for NEPA purposes. *See, e.g., Lange v. Brinegar,* 625 F.2d 812 (9th Cir.1980); *Essex Co. Preservation Ass'n v. Campbell,* 536 F.2d 956, 960 (1st Cir.1976); *Sierra Club v. Marsh,* 714 F.Supp. 539, 556 (D.Me.1989).

Further, Plaintiffs' allegation has no basis for support in the record, which is replete with evidence that FHWA was involved throughout the NEPA process. (*See, e.g.,* AR00948–956; AR05891–95; AR06929.) The most telling example of FHWA's independent review of the NEPA analysis is the fact that the first EA/4(f) UDOT submitted to FHWA for approval and issuance of a FONSI was rejected, and the document underwent three additional months of study and supplementation before it was approved. (*See* AR05405–736; AR05764; AR06929.) Given this evidence in the record, it is clear that FHWA made an independent evaluation of the Project before it decided to issue a FONSI.

Based on the analysis above, the court finds that the record indicates that FHWA "followed the necessary procedural requirements" under NEPA. *Overton Park,* 401 U.S. at 416–17, 91 S.Ct. 814. FHWA "took a 'hard look' at the relevant factors," and therefore the court must "uphold the agency's decision" because it has determined that there has not been a "clear error of judgement." *Boomer Park,* 4 F.3d at 1551, 1556. Plaintiff has also not demonstrated, in its challenge to NEPA process under examination here, "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ... deserving of more deliberate investigation." *Federal Lands Legal Consortium,* 195 F.3d at 1194. Therefore, the court finds that Plaintiffs have not made a showing of substantial likelihood of success on the merits of their NEPA challenge.

### C. Did Defendants Likely Violate § 4(f) of the Transportation Act?

Plaintiffs also contend that the Secretary of Transportation violated § 4(f) of the Transportation Act by approving the Project without making the requisite determinations required by that statute. 49 U.S.C. § 303(c). § 4(f) provides:

The Secretary of Transportation may approve a transportation program or project ... requiring the use of publically owned lands of a public park, recreation area, ... or land of an historic site ... *only if* (1) there is no prudent and feasible alternative to using the land and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, ... or historic sites resulting from the use.

49 U.S.C. § 303(c) (emphasis added). The Tenth Circuit has held that the standard of review of a § 4(f) determination is deferential and has also noted that the Supreme Court's decision in *"Overton Park* instructed reviewing courts to conduct a three-tiered inquiry of the Secretary of Transportation's decision to fund a highway across land covered by 4(f). First, the reviewing court is 'required to decide whether the Secretary acted within the scope of his authority' under § 4(f)." *Boomer Lake,* 4 F.3d at 1549. This first tier of inquiry involves a determination of whether "the Secretary could have *reasonably believed ... there are no feasible and prudent alternatives." Id.* (emphasis added). "Second, the court must decide whether the Secretary's ultimate decision was arbitrary and capricious, an abuse of discretion or not otherwise in accordance with the law." *Id.* And third, "reviewing courts [should] determine whether the Secretary's action followed the necessary procedural requirements." *Id.* Finally, the *Boomer* court noted that this inquiry "must be probing and thorough, but the

Secretary's decision is entitled to the presumption of regularity." *Id.*

With regard to the first prong of the test, Plaintiffs complain that the Secretary failed in his § 4(f) analysis because he is under a statutory mandate to avoid Willow Creek Park, the Jordan River Parkway, and the historical properties in the area. Plaintiffs also allege that the Secretary did not analyze all possible alternatives. Plaintiffs finally contend that the Secretary's mitigation plans were insufficient to minimize harm to public parks and historic properties in the area.

■■■ With regard to the Secretary's obligations under § 4(f), the Tenth Circuit specifically has noted:

> In general, the Secretary's obligation under § 4(f) is to examine enough alternatives to permit a sound judgment that the study of additional [alternative routes] is not worthwhile. Although the existence of an unexamined yet viable alternative route that avoids the acquisition of parkland may form the basis for reversing the Secretary's decision, the decision concerning which alternatives to consider is necessarily bounded by a rule of reason and practicality.

4 F.3d at 1551. The *Boomer Park* court also observed that alternatives which do not meet the articulated need and purpose of the project are not "prudent" for the purposes of the § 4(f) analysis. *See id; see also Lake Hefner Open Space Alliance v. Dole,* 871 F.2d 943, 947 (10th Cir.1989) (noting: "In this case the 'no-build' alternative was rejected because the existing streets would not be able to accommodate future traffic volumes."). In a more recent analogous case from the Tenth Circuit, the court noted that "an alternative that does not solve existing or future traffic problems, such as the congestion problem at issue in this case, may be properly rejected as imprudent." *Associations Working for Aurora's Residential Environment v.*

*Colorado Dept. of Transp.,* 153 F.3d 1122, 1131 (10th Cir.1998). Keeping this in mind, it seems that Plaintiffs' contention that the Secretary was under an obligation to avoid the Jordan River Parkway entirely is legally insufficient. Because the articulated purpose and need for the Project is, in part, to provide another crossing point of the Jordan River, such an alternative would be *per se* unfeasible and imprudent because any alternative addressing the purpose and needs articulated for the Project would necessarily have to cross the Jordan River Parkway. Therefore, an alternative that suggested that the Project completely avoid the Jordan River Parkway would not be "feasible" and therefore could be discounted in conformance with the statute. As discussed above in the court's review of the NEPA process, the Secretary did analyze all adequate alternatives. The Secretary therefore satisfied his first obligation under § 4(f) because he reasonably determined that there was no feasible or prudent alternative to the Project.

■■■ As to the Secretary's second responsibility under 4(f), the Secretary must take measures to minimize harm to public parks and historic sites resulting from the use. State Defendant's provided ample evidence at the hearing on this matter that, in fact, Willow Creek and half of the Jordan River Parkway are privately held and that therefore § 4(f) does not apply to those properties. On the issue of historic sites specifically, as discussed above, UDOT has entered into a Memorandum of Agreement with the State Historical Properties Officer, as required by § 4(f)'s implementing regulation, to fully survey and market properties for relocation, with conservation easements securing their long-term maintenance. *See* 23 C.F.R. § 771.135(e). These measures fulfill the statutory mandate for the Secretary to minimize harms to historic sites. With

regard to the section of the parkway that is publicly held, UDOT committed to a bridge design that will allow for pedestrian and equestrian traffic beneath the planed road. (*See* EA/4(f) at 4–40.) The design provides for construction of a trail along the west side of the river and sidewalks on both sides of the roadway. *See id.* These measures fulfill the Secretary's statutory requirement to minimize the harms to public properties and parks covered by the statute.

Given that the Secretary reasonably determined that there were no feasible or prudent alternatives to the project, and that he took measures to minimize harms to properties protected under § 4(f), "the Secretary acted within the scope of his authority' under § 4(f)." *Boomer Lake,* 4 F.3d at 1549. Furthermore, based on the above discussion, and the analysis of the Secretary's actions in carrying out the NEPA process, the court finds that the Secretary's decision was not "arbitrary and capricious, an abuse of discretion or not otherwise in accordance with the law." *Id.* Finally, for the same reasons, "the Secretary's action followed the necessary procedural requirements." *Id.*

Therefore, the court finds that Plaintiffs have not made a showing of substantial likelihood of success on the merits of their § 4(f) or NEPA challenges. Plaintiffs have not even made a showing of "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ... deserving of more deliberate investigation." *Federal Lands Legal Consortium,* 195 F.3d at 1194. Therefore, the substantial likelihood of success on the merit element weighs strongly in favor of Defendants.

### 1. Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, and actual. Irreparable harm cannot be speculative; the injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army,* 963 F.Supp. 1083, 1095 (D.Utah 1997) (emphasis and brackets in original, citations and internal quotations omitted).

The Plaintiffs in this case allege that their injury is irreparable for several reasons. First, Plaintiffs correctly note that, where a court finds that the plaintiff in a NEPA case has demonstrated a substantial likelihood of success on the merits, irreparable harm is presumed. *See Southern Utah Wilderness Alliance v. Thompson,* 811 F.Supp. at 641 ("Although an injunctive remedy does not follow automatically from every finding of violation of NEPA, a presumption exists in favor of injunctive relief, especially when the NEPA violation is substantive, rather than technical.") (citations omitted). "[A]lleged violations of NEPA are themselves irreparable since the purpose of NEPA is to ensure that the agency and the public is aware of environmental consequences of a project before construction commences." *Provo River Coalition v. Pena,* 925 F.Supp. 1518, 1524 (D.Utah 1996) (citations omitted). As discussed above, however, Plaintiffs have not demonstrated a likelihood of success on the merits and are therefore not entitled to a presumption of irreparable harm.

Second, Plaintiffs assert that the project would disturb the quiet, rural character of their neighborhood. They also assert that the Project will decrease their ability to enjoy the area's wildlife and natural environment. Even assuming this to be true, the record reflects that the Federal Defendants fully considered this as a potential impact of the Project during their EA process but determined that the noise

resulting from the project was not so significant as to warrant abandonment of the project. The Federal Defendants also determined that various mitigation measures could be used to reduce noise pollution from the project. Moreover, all highways produce these supposedly irreparable harms—increased noise and traffic. Were noise or traffic to constitute irreparable harm, residents living near planned highway construction sites would always be able to obtain injunctive relief against the construction of *any* highway, even if federal government agencies had already fully complied with NEPA requirements. This harm, therefore, has been addressed and minimized by the NEPA process itself and is not irreparable.

 Finally, Plaintiffs have also testified that locating the large basin and distribution of storm water near and in Willow Creek will decrease their ability to use Willow Creek for irrigation and stockwatering. Plaintiffs have not demonstrated, however, that these injuries could not be compensated for with money damages. Injunctive relief is "appropriate when the remedy at law is inadequate to compensate the injury sustained." *Tri–State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 874 F.2d 1346, 1353 (10th Cir.1989) (commenting in context of permanent injunction relief); *accord Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n,* 725 F.2d 564, 570 (10th Cir.1984) ("If damages can compensate a plaintiff an injunction will not lie.") Just as one could calculate the diminished value of a home were access to a neighborhood park or pond cut off, here it appears that any decreased ability to utilize Willow Creek as a source of water or outdoor enjoyment could be similarly calculated. "Where there is a full, complete, and adequate remedy at law through recovery of calculable money damages, the injury is not irreparable and equity will not apply the extraordinary remedy of injunction." *SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs.,* No. 00–3051, 2000 WL 797338, at *4 (10th Cir. May 26, 2000). Moreover, Plaintiffs have not conclusively demonstrated that this is a compensable injury at all—the changes to the Willow Creek area will not take place *on* Plaintiffs' property, but rather on property that is merely *nearby* Plaintiffs' property. It is not clear at this stage of the proceedings that Plaintiffs can recover for such a tenuous injury.

Plaintiffs have not, therefore, demonstrated that harms from the Project are certain, imminent, or not compensable in money damages. Accordingly, the element of irreparable harm in this case weighs in favor of Defendants and against the issuance of preliminary injunctive relief.

### 2. Balance of Harms

State Defendants contend that, should a preliminary injunction issue in this case, the construction schedule for the project will be delayed at least five months and possibly up to two years. This delay, according to the state Defendants, will result in financial penalties under the contract ranging from $69,105 to $1,489,105. Denial of Plaintiffs request for injunctive relief, however, is not necessary to address these alleged contractual harms, as they are easily calculable and compensable in money damages. Rule 65(e) of the Federal Rules of Civil Procedure requires a plaintiff who succeeds in demonstrating the need for preliminary injunctive relief to post a security for exactly this reason—to cover any financial harm to defendants if it is determined after a full trial on the merits that plaintiffs are not in fact entitled to injunctive relief.

Defendants next contend that it is possible that, should the project be delayed too long, the contractor will choose to cancel

the contract and the project will be permanently compromised. This harm is speculative, however, because the contractor has the right to renew the contract through December 31, 2001, and Defendants have not offered any evidence to suggest that the contractor would not wish to renew the contract.

The primary issue here is solely whether Defendants violated the NEPA and § 4(f) processes. Surely, Defendants cannot claim any harm at all if the action they seek to take is in violation of NEPA and § 4(f). Defendants would not have a claim to the benefits of speedy work on the project if that work would be in violation of the law. However, Plaintiffs have not made a showing that Defendants likely violated either NEPA or § 4(t).

Accordingly, the balance of harm element favors neither party.

### 3. Public Interest

Defendants contend that the issuance of a preliminary injunction will harm the public interest (1) by possibly forcing taxpayers to pay for substantial contractual penalties, and (2) by delaying the construction of an allegedly vital highway project supported by elected public officials. Defendants are correct that the public does maintain a general interest in keeping down State operating costs and in obtaining access to highways. The public also maintains an interest, however, in ensuring that government construction projects will not irreparably harm the environment. This public interest would be achieved by the very injunctive relief Plaintiffs in this case seek: a preliminary injunction barring further work on the project until Defendants have fully complied with the requirements of NEPA and 4(f). "In general, courts have found the public interest requiring NEPA compliance prior to a project proceeding is suffi-cient to justify an injunction." *Provo River*, 925 F.Supp. at 1525.

Were Plaintiffs to make a strong showing of likelihood of success on the merits, the public interest prong of the preliminary injunction test would tip in their favor. As discussed above, however, Plaintiffs have not demonstrated a substantial likelihood of success on the merits. Therefore, the public interest of prong of the preliminary injunction test favors Defendants slightly.

### Order

For the reasons set forth above, Plaintiffs' motion for preliminary injunction is DENIED.