**UTAH COUNCIL, TROUT UNLIMITED, et. al,
Plaintiffs,**

v.

**UNITED STATES ARMY CORP OF ENGINEERS, et. al,
Defendants.**

No. 2:00–CV–00623C.

United States District Court,
D. Utah,
Central Division.

March 6, 2002.

Joro Walker, Land & Water Fund of the Rockies, Salt Lake City, UT, for Plaintiffs.

Daniel D. Price, U.S. Attorney's Office, Lisa Lynne Russell, U.S. Department of Justice Land and Resource Division, Washington, DC, Jon M. Lipshultz, U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, Eric S. Gould, Springfield, VA, for Defendants.

## ORDER

CAMPBELL, District Judge.

This matter is before the court on Plaintiffs' Appeal and Motion to Remand Agency Action. The court held a hearing on this matter on October 1, 2001, and for the reasons set for below DENIES Plaintiffs' appeal and motion to remand.

### Background

This case involves a challenge to the Army Corp of Engineers' ("ACE") decision to allow the construction of a pipeline project and a water treatment plant through its Nationwide Permit ("NWP") program. Plaintiffs Utah Council, Trout Unlimited et. al. ("TU" or "Plaintiffs") contend that ACE's decision to allow essentially three projects-the East Canyon Pipeline, the Jeremy Ditch Pipeline, and the East Canyon Water Treatment Plant-violates several federal provisions, including the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the National Environmental Preservation Act ("NEPA"), 42 U.S.C, § 4321 *et seq.*, the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.*, and the Federal Wildlife Coordination Act ("FWCA"), 16 U.S.C § 661 *et seq.*, Plaintiffs appeal the agency decision that the projects met NWP standards. They contend that this action violated both the APA and NEPA and that therefore this matter should be remanded to the Agency so that the review process can proceed under the proper legal guidelines.

The factual documentation in the record and the parties' briefs are voluminous and will be referenced only where applicable.[1] Plaintiffs are groups of fishermen and others concerned with the environment who contend that the ACE improperly permitted several projects that would adversely affect streams which contain fisheries of the Bonneville Cutthrout trout (*"oncorhynchus clarki Utah"*). Plaintiffs understandably lament the fact that a once thriving but now ailing ecosystem is not what it once was. In the present action, they contend that the ACE's recent action of permitting, or not acting, and therefore permitting *de facto* the three projects, violated the statutes mentioned above.

The three projects together were essentially envisioned to supply additional water to Summit County, Utah, for drinking water and snow making purposes. Plaintiffs argue that the projects impermissibly impact the water in the watershed by raising water temperatures (as a result of decreased flows, which affect trout populations) and by increasing phosphorus and other minerals to impermissible levels. Plaintiffs contend that permitting the projects was improper because the projects threaten several historic or possibly historic trails, including the Mormon Pioneer Trail and the Pony Express Route.

In the course of evaluating the projects, ACE, complied information received from the Environmental Protection Agency ("EPA"), the Fish and Wildlife Service ("FWS"), the Utah Department of Water Quality ("DWQ"), and the State Historic

---

1. There are two administrative records in this case, one for the East Canyon Creek pipeline and water treatment plant projects, and a separate one for the Jeremy Ditch Pipeline.

The court will use the same abbreviation (AR) for the East Canyon Creek pipeline and water treatment plant projects record that was used by Plaintiffs and Defendants.

Preservation Officer ("SHPO") for the State of Utah, among other parties. These parties all raised concerns regarding the permitting of these projects but the DWQ and the SHPO ultimately acknowledged their approval of the permits. At the basis of Plaintiffs' complaint is the question of whether the ACE gathered the information properly, accorded it proper weight, and considered it in a legally sufficient manner before deciding that the proposed projects conformed with NWP standards.

Plaintiffs believe that the ACE improperly permitted, or permitted de facto, the projects without giving the proper credence to the parties who did comment on the projects, and that the ACE did not allow public notice and comment before issuing the permits for the projects. As a result, Plaintiffs contend that: 1) the ACE unlawfully issued NWPs for the projects when it was legally obligated to require an Individual Permit (which would invoke the full NEPA process) for the projects; 2) the ACE failed to ensure that the projects would not further degrade the water quality of the watershed; 3) the ACE failed to analyze alternatives to the projects even though alternatives might have been available; 4) the ACE failed to undertake even minimal NEPA analysis (which, as discussed below, dovetails into Plaintiffs' first objection); 5) the ACE failed to comply with the FWCA even though the trout were threatened; and 6) the ACE ignored the NHPA despite entreaties from parties to preserve Historic Trails in the East Canyon.

## Analysis

### A. Mootness

The issue before the court is whether ACE's determination that the projects were in accord with existing NWPs violated the APA and NEPA. Because at least two of the projects have been completely or partially completed, there is a question whether Plaintiffs' challenge to those actions is now moot.

The Constitution limits this court's jurisdiction to those matters involving live "cases" or "controversies." U.S. Const. Art. III § 1. This constitutional restriction of this court's jurisdiction precludes it from adjudicating moot controversies. *See Central Wyoming Law Assoc. v. Denhardt,* 60 F.3d 684, 687 (10th Cir.1995). "In general, a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.*

> Parties lack a legally cognizable interest in the outcome of a case if "(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, ... and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."

*City of Albuquerque v. Browner,* 97 F.3d 415, 420 (10th Cir.1996) (citation omitted).

Defendants represented at the hearing on this matter that the Jeremy Ditch pipeline has been completed in its entirety, and all of the construction of the water treatment plant that involves placement of fill in wetlands and other jurisdictional waters has been completed. Defendants also point out that it is uncertain whether the East Canyon Pipeline, which is partially complete, will ever be completed at all, though the parties have informed the court that the permit holder has applied for an extension of the permit, which expired on December 14, 2001. The ACE has not made a decision regarding the verification of the application for renewal. It also appears that the mitigation measures agreed to by the permit applicants have been completed for these sites. Plaintiffs cite two Tenth Circuit cases-*City of Albuquerque v. Browner,* 97 F.3d 415 and *Air-*

port Neighbors Alliance, Inc. v. United States, 90 F.3d 426 (10th Cir.1996)-for the proposition that their claim is not moot because they still have substantive claims that the permit procedure under the NWP was violated. As a general principle, Plaintiffs are correct, but their remedies are limited to procedural remedies.

In *Airport Alliance*, the Tenth Circuit stated that courts will "still consider NEPA claims after the proposed action has been completed when the court can provide some remedy if it determines that an agency failed to comply with NEPA." 90 F.3d at 428–29. The Tenth Circuit pointed out that it could still order restriction of the amount of flights and the flight paths that planes would take even though the runway was already constructed. *Id.* at 429. The court noted that if it found that NEPA had been violated, then it could remand the matter to the agency to follow NEPA procedure to consider mitigation measures. *Id.* Importantly for this case, the court also specifically noted "the fact that the upgrade of [the runway] has been completed renders moot any claim relating to the *construction* of the runway." *Id.* (emphasis in the original).

In this case, following the rule from *Airport Alliance*, the Plaintiffs' challenges relating to the construction of the completed projects are moot. However, the court may consider whether the mitigation measures were adequate under the NWP program for the three projects and order procedural relief if the agencies did not follow the mandate of NEPA and the APA. *See Airport Alliance*, 90 F.3d at 429 (noting that the court may remand to agency to fully consider mitigation).

## B. Standard of Review

■ The Tenth Circuit has held that APA challenges in district court should be processed as appeals, not as summary judgment proceedings, with the Federal Rules of Appellate Procedure providing guidance. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir.1994). Challenges to ACE permitting determinations under the statutes at issue here are subject to the deferential standard of review set out in the APA. *See, e.g., Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 104 L.Ed.2d 377. (1989) (applying APA in context of NEPA challenge); *Morongo Band of Mission Indians v. Federal Aviation Admin.*, 161 F.3d 569, 573 (9th Cir.1998) (applying APA in context of NHPA); *Preserve Endangered Areas of Cobb's History, Inc. v. Corps of Engineers*, 87 F.3d 1242, 1247 (11th Cir.1996) (applying same in CWA section 404 permits); *Shoreline Assocs. v. Marsh*, 555 F.Supp. 169, 173 (D.Md.1983), aff'd. 725 F.2d 677 (4th Cir.1984) (same). A number of established rules limit a court's review. Most importantly, a court may invalidate a final agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ The party bringing an APA challenge bears the burden of demonstrating that the agency's actions were arbitrary and capricious. *See Committee to Preserve Boomer Lake v. Department of Transp.*, 4 F.3d 1543, 1555 (10th Cir.1993).; *see also, e.g., Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995). The scope of review under this standard is narrow, and a court may not substitute its judgment for that of the agency. *See Boomer Park*, 4 F.3d at 1555; *Davis v. Slater*, 148 F.Supp.2d 1195, 1202 (D.Utah 2001). A court's role on review is quite limited: "a disagreement ... in methodologies employed is generally not sufficient to invalidate [an agency decision]." *Davis*, 148 F.Supp.2d at 1202 (*citing Boomer Park*, 4 F.3d at 1555). In conducting its review,

the court is confined to the administrative record compiled by the agency. *See, e.g., Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976); *Cronin v. United States Dept. of Agriculture*, 919 F.2d 439, 443–44 (7th Cir.1990); *Davis*, 148 F.Supp.2d at 1203–4. A court's duty is to determine "whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Olenhouse*, 42 F.3d at 1574; *see also United States v. Burlington N. R.R. Co.*, 200 F.3d 679, 688 (10th Cir.1999). In determining the degree of deference due the agency action, courts "heed the nature and context of the challenged agency action or inaction." *Maier*, 114 F.3d at 1039.[2]

■■ Finally, agency interpretation of those particular statutes and regulations that the agency administers is entitled to substantial deference. *See SUWA v. Dabney*, 222 F.3d 819, 824 (D.Utah 2000). As far as statutory questions, if Congress' intent is not clear from the face of the statute, the agency's interpretation of the statute should be upheld as long as it is reasonable, even if the court might initially have interpreted the statute differently than the agency. *See id.* at 824, 828–29; *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744–45, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996); *Chevron, U.S.A., Inc. v. NRDC.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An agency's interpretation of its own regulations is entitled to deference, and must be given "controlling weight unless it is plainly erroneous or inconsistent with the regula-

tion." *Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1254 (D.C.Cir.1999) (citation omitted); *see also, e.g., Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1165 (10th Cir.1999) (en banc) (same).

### C. Substantive Claims

The statutory requirements of NEPA, the NHPA and the FWCA, as they apply under the facts of this case, must be understood as they are filtered through the regulatory scheme of the NWP program.

#### 1. The Clean Water Act

The Clean Water Act ("CWA" or the "Act") is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, and pertinent to this case, the Act prohibits discharge of any pollutant, including dredged or fill material, into navigable waters unless authorized by a CWA permit. See 33 U.S.C. § 1311(a). The CWA defines "navigable waters" as "waters of the United States." Certain wetlands are included in that definition. 33 C.F.R. § 328.3(a),(b).

Section 404 of the Clean Water Act mandates that the ACE must regulate, through the issuance of permits, discharges of dredged and fill material into wetlands. See 33 U.S.C. § 1344. The ACE may issue individual or general permits. See 33 U.S.C. § 1344(a), (e). Individual permits are issued on a case by case basis, after an intensive review that includes, among other things, extensive site-specific documentation, public hearings and review,

---

2. Such is especially the case here where, as discussed below, NWP verifications typically require a response from the ACE, if any, within thirty days. *See* 33 C.F.R. § 330.1(e)(1) (noting thirty day time period). NWP processes allow for the ACE to quickly permit when it satisfies itself the a project meet NWP standards and that its impacts will

be minimal. *See* 33 C.F.R. § 330.1(e)(2). The brevity of the ACE's documentation is irrelevant; the only relevant consideration is whether the agency's rationale may be "reasonably discerned" from the administrative record. *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422 (D.C.Cir.2000).

and a formal determination. The ACE may also issue general permits on a state, regional, or nationwide basis. *See* 33 C.F.R. Parts 323, 325. The requirement for issuance of general permits are far less exacting. The ACE may issue general permits for "any category of activities involving discharges of dredged or fill material if the [ACE] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

■ Nationwide Permits ("NWP") identify categories of activities for which the ACE does not require an individual section 404 permit, even though the activity will result in some discharge of dredged or fill materials into navigable waters. *See* 33 C.F.R. §§ 323.2(h), 330.2(b). The NWP program is "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b). Because the projects at issue here were authorized by the ACE under the NWP program, explanation of the procedures governing NWP is necessary. At the time they are issued, NWPs must meet the guidelines issued by EPA and the ACE under Clean Water Act section 404(b)(1), 33 U.S.C. § 1344(e)(1). These "404(b)(1) Guidelines," codified at 40 C.F.R. Part 230, establish criteria to ensure that individual or general permits issued by the ACE protect the environment by eliminating unnecessary impacts as much as possible. The ACE applies these guidelines at the time that it promulgates the NWPs, and no further evaluation pursuant to section 404(b)(1) is required when a project proponent requests to undertake activities pursuant to an established NWP. *See* 40 C.F.R. § 230.6(d). Moreover, and particularly relevant to Plaintiffs' claim under NEPA, the ACE performs the required NEPA analysis at

the time that it promulgates NWPs. *See, e.g., Defenders of Wildlife v. Ballard,* 73 F.Supp.2d 1094, 1109–11 (D.Ariz.1999). As a result, no further NEPA evaluation is required when a party begins a project under the authorization of a NWP. *See, e.g., Abenaki Nation of Mississquoi v. Hughes,* 805 F.Supp. 234, 246–47 (D.Vt. 1992), *aff'd,* 990 F.2d 729 (2d Cir.1993) (per curiam).

In contrast to individual 404 permits, NWPs are issued when the ACE formally adopts and publishes them in the Federal Register after a hearing and the opportunity for public comment. *See Industrial Highway Corp. v. Danielson,* 796 F.Supp. 121, 127 (D.N.J.1992), *aff'd without opinion,* 995 F.2d 217 (3d Cir.1993). Accordingly, individuals do not "apply" for NWPs, and the ACE does not "issue" NWPs to individuals. Rather, the NWPs themselves authorize the limited dredging and filling activities within a scope defined by a given NWP. *See Riverside Irrigation Dist. v. Andrews,* 758 F.2d 508, 511 (10th Cir.1985). If a proponent's project meets the terms and conditions of a NWP, then no individual permit is necessary and that proponent "may simply operate under the nationwide permit without informing the [ACE] in advance unless the nationwide permit in question requires advance approval." *New Hanover Township v. United States Army Corps of Eng'rs,* 992 F.2d 470, 471 (3d Cir.1993); *see also* 33 C.F.R. §§ 320.1(c), 325.5(c)(2), 330.1(c) & (e), 330.2(c). A proponent simply proceeds under the authority of the relevant NWP, subject to the ACE's ultimate authority to determine or verify compliance with that NWP. *See* 33 C.F.R. § 330.2(c). Under the NWP program, upon receiving a verification request, the ACE simply determines whether the activity complies with the terms and conditions of the NWP. However, the ACE may add conditions to ensure compliance with the NWP or to

minimize adverse effects. *See* 33 C.F.R. §§ 330.6(a) & (a)(3)(i).

Courts necessarily distinguish between NWP verification and the more rigorous consideration required by a request for an individual 404 permit. *See, e.g., New Hanover Township,* 992 F.2d at 471–73; *Lotz Realty Co. v. United States,* 757 F.Supp. 692, 695 (E.D.Va.1990). Verification under an NWP proposal, due to the streamlined role set out by the NWP program, is a simpler, far less rigorous process than evaluation of an individual 404 permit application. *See, e.g., Orleans Audubon Soc'y v. Lee,* 742 F.2d 901, 909–10. (5th Cir.1984). In essence, NWP verification requires only that the ACE confirm that a proponent's activities qualify for authorization under the relevant NWP. In most cases, the proponent must simply notify ACE of its plans. *See* 33 C.F.R. §§ 325.1(c), 330.1(e).

At the time of the ACE's verification decision in this case, there were over three dozen NWPs in effect. *See* 61 Fed.Reg. 65,874, 65,913–19 (Dec. 13, 1996). The two NWPs at issue in this case are NWPs 12–the East Canyon Pipeline-and 26–the East Canyon Water Treatment Plant. Each NWP contains specific terms and each is subject to the general conditions of all NWPs. NWP 12 covers "discharges of dredged or fill material associated with excavation, backfill or bedding for utility lines." *Id.* NWP 26 applies to "[d]ischarges of dredged or fill material into headwaters and isolated waters." *Id.*

Two of the general conditions applicable to all NWPs have relevance to this case. The first is General Condition 12 ("Historic Properties"), which requires the proponent to notify ACE if the proposed activity may affect historic properties listed on, or eligible for listing, on the National Register of Historic Places. If such is the case, then the activity may not commence until the ACE has conducted a review pursuant to 33 C.F.R. Part 325, Appendix C. *See* 33 C.F.R. § 330.4(g). Second, General Condition 13 ("Notification"), which applies to NWPs 12 and 26 under certain circumstances, requires the proponent to provide the ACE with a Pre–Construction Notification ("PNC") as early as possible; where a PNC is required, the proponent may begin construction only if the ACE notifies the proponent that it may proceed or if a set time period passes without such notification. *See id.*

Plaintiffs contend that the ACE's authorization of the projects under NWP 12 and 26 was arbitrary and capricious. Plaintiffs raise a number of arguments in support of their contention. As discussed below, Plaintiffs' arguments are not persuasive.

*a) The ACE Properly Found that NWP 26 Applied and Made a Reasonable Headwater Determination*

The ACE authorized the water treatment plant under NWP 26. This permit applied, at the time, to discharges of dredged or fill material into "headwaters" that did not "cause the loss of more than three acres of waters of the United States for a distance greater than 500 linear feet of the stream bed." 61 Fed.Reg. 65,916. The three acre limitation under NWP 26 is "absolute," and includes impacts not only from the NWP 26 section of a given project, but any other part of the same project that is authorized by a different NWP. *Id.* at 65,917. Under ACE regulations, "headwaters" are defined, in pertinent part, as "non-tidal rivers, streams, and their lakes and impoundments, including *adjacent wetlands,* that are part of the surface tributary system to an interstate or navigable water of the United States upstream of the point on the river or stream at which *the average annual flow is less than five cubic feet per second."* 33 C.F.R. § 330.2(d) (emphasis added). Plaintiffs contend that the water treatment

plant should not have been authorized under NWP 26 for basically two reasons: 1) the wetlands affected by the treatment plant are below the headwaters of East Canyon Creek; and 2) the impacts of the treatment plant and the East Canyon pipeline must be considered together and cumulatively exceed the three acre limitation of NWP 26.

### 1) The ACE Made a Reasonable "Headwaters" Determination

NWP 26 requires the project proponent to submit a wetlands delineation to the ACE for projects that will involve discharges into wetlands. *See* 61 Fed.Reg. at 65,916. Summit Water Distribution Company's ("SWDC") proposal for the treatment plant project area was first approved by the ACE in November 1998, and was updated in April 1999. It was resubmitted with SWDC's application for the treatment plant project in November 1999. *(See* AR 28, 31–32, 1641.) Summit Water Distribution Company's proposal indicated that the treatment plant project would cause an impact to 0.14 acres of wetlands and roughly 400 feet of the channel of a small, unnamed stream that discharges into wetlands associated with East Canyon Creek. (*See* AR 28.) The proposal acknowledged that the impacted wetlands and the unnamed stream were both subject to the ACE's regulatory jurisdiction. *See id.* Significantly, none of the wetlands identified in the report were deemed to be associated with East Canyon Creek; most of the wetlands were identified as associated with the unnamed stream and/or an isolated pond designed to collect highway runoff. *See id.* In fact, the proposal suggested that the project was intentionally designed to "avoid the large wetland area associated with the East Canyon Creek flood plain." *Id.* On a field visit to the treatment plant site on November 30, 1999, ACE personnel confirmed these representations. (*See* AR 63.)

■ In reference to the headwaters determination, Plaintiffs do not argue that the average annual flow of the unnamed stream is less than five cubic feet per second-in other words above the headwaters-at the project location. *See* 33 C.F.R. § 330.2(d) (defining headwaters). Rather, they assert that the average annual flow of East Canyon Creek, which is in the general location of the treatment plant, is greater than five cubic feet per second. But the question of the average annual flow of East Canyon Creek is not relevant. The ACE reasonably determined that the headwaters determination should be made with reference to the flow of the unnamed stream, not East Canyon Creek.

The record demonstrates that before the construction of the treatment plant, the channel of the unnamed stream sat within or directly abutted the wetlands affected by the treatment plant's construction, and that both the stream and its wetlands were at approximately the same elevation. (*See* AR 28, 31 (map/delineation of treatment plant area).) The record also demonstrates that the impacted wetlands are 300–400 feet from East Canyon Creek and roughly eight to ten feet above East Canyon Creek in elevation, well outside East Canyon Creek's floodplain. *Id.* The ACE personnel reasonably determined, even at the early stages of the review process, that NWP 26 would apply because "[t]he waters that would be filled are not supported by East Canyon Creek, although they drain to wetlands adjacent to the creek." (AR 759.)

The record therefore amply demonstrates that ACE's decision to make the headwaters determination with reference to the unnamed stream, not East Canyon Creek, was entirely reasonable. The applicable headwaters regulation (33 C.F.R.

§ 330.2(d)), as discussed above, applies the five cubic feet per second "headwaters" determination to "non-tidal ... streams ... including adjacent wetlands, that are part of a surface tributary system to an interstate or navigable water of the United States...." 33 C.F.R. § 330.2(d). Because the record demonstrates that the impacted wetlands are well away from and well above East Canyon Creek in elevation, the "tributary system" in question is the unnamed stream and its associated wetlands.

### 2) The ACE Reasonably Determined that the Three Acre Limitation was not Exceeded

As discussed above, NWP 26, at the time, could not be applied to discharges of dredged or fill material that "cause the loss of more than three acres of waters of the United States for a distance greater than 500 linear feet of the stream bed." 61 Fed.Reg. 65,916. Plaintiffs argue that even if ACE's headwater determination was reasonable, NWP 26 was still inapplicable to the project because the total adverse impacts of the project would exceed three acres. Plaintiffs also contend that the total adverse impacts calculation from the East Canyon pipeline should have been added to the impacts from the water treatment plant because it should be considered part of the same project. Even assuming, for the sake of argument, that the impacts from the two project should be combined, the record demonstrates that the three acre limitation was not exceeded.

The record shows that the construction of the treatment plant and the East Canyon Pipeline have an impact on 0.14 and 0.03 acres of wetlands and other jurisdictional waters, respectively. (See AR 1, 4, 8, 19, 26, 28–29.) At best, then, Plaintiffs' argument is correct only if there is evidence in the record demonstrating that an additional 2.83 acres would be adversely impacted by the projects. Plaintiffs rely on

two undated two-page studies completed by Bio–West, Inc. (See AR 257–60; see also Pl's Opening Br. at 36.) The first of these reports (the "Reservoir Study") has estimated that an annual 5,000 acre-feet of water withdrawals from the pipeline project might result in the loss of approximately 23–36 acres of surface area from the East Canyon Reservoir. The second study (the "Creek Study") gives an estimate that decreased flows in East Canyon Creek from the water withdrawals could result in a decrease of wetland acreage (ranging from approximately 0.1 to 10 acres under various assumed scenarios) adjacent to lower portions of the Creek. (See AR 257–58.)

The record demonstrates that these two reports and other, related critiques by project opponents, were considered by ACE personnel in numerous meetings, phone conversations, and correspondence. (See, e.g., AR 70, 261–62, 1140–84.) The record makes clear that the ACE discounted the two studies because they were based upon faulty assumptions-such as assuming that pipeline withdrawals would translate directly into releases into East Canyon Creek, and assuming that "none of the water removed returns to the reservoir as inflow." (See AR 257, 259.) Most significantly, the studies do not adjust their analysis for a 1998 agreement between Summit Water Distribution Company and the Utah Department of Wildlife Resources. The studies further do not take into account the existing diversion rights that would be foregone upon approval of the pipeline. (AR 257, 259.) Finally, according to the Creek Study, the 5,000 acre feet assumed as the withdrawal would only result in a reduction of stream surface area in East Canyon Creek of less than one acre, a figure which would still bring the total possible affected acres well below the three acre limit. (See AR 258.)

■ In view of the above, Plaintiffs have not met their burden of demonstrating that the ACE was arbitrary and capricious in its decision to not accept the study's conclusions. Accordingly, the ACE's determination that the project would not have adverse impacts on more than three acres, and that therefore, NWP 26 applied to the project, was not arbitrary and capricious.

*b) The ACE Reasonably Determined that the East Canyon Creek Pipeline was Authorized Under NWP 12*

Plaintiffs challenge the ACE's determination that the East Canyon Creek Pipeline was authorized by NWP 12. Plaintiffs contend that this verification was faulty on two grounds: 1) that NWP 12 should not have been applied because the project runs parallel rather than perpendicular to East Canyon Creek; and 2) that the ACE gave insufficient consideration to the proposed pipeline's impact on water quality in East Canyon Creek.

NWP 12 applies to "[d]ischarges of dredged or fill material associated with excavation, backfill or bedding for utility lines, including outfall and intake structures, provided there is no change in preconstruction contours." 61 Fed.Reg. at 65,914. NWP 12 allows limited temporary sidecasting[3] into waters of the United States during construction, and requires "exposed slopes and stream banks [to] be stabilized upon completion of the utility line." *Id.* at 65,915. The ACE noted that East Canyon Creek had been listed by the State of Utah as "an impaired waterway due to total phosphorous and dissolved oxygen[,]" pursuant to CWA, 33 U.S.C. § 1313(d). (AR 1.) Concerned, the ACE advised the project proponent, Davis & Weber Counties Canal Company ("DWCCC"), to exercise "extreme caution ... when excavating through these waters" and prohibited any sidecasting "in any water body or wetland." *Id.*

■ Considering Plaintiffs' argument that NWP 12 does not authorize parallel running projects, the court can find no legal support for such a proposition. Plaintiffs do not cite the language of the permit itself for support, but instead rely on statements in the preamble to the 1996 Federal Register notice in which NWP 12 was issued. In these statements, the ACE noted, in response to comments suggesting that only perpendicular (rather than parallel) "stream crossings" be allowed under NWP 12, that utility lines are "generally" placed perpendicular to streams and that the ACE would "critically evaluate" projects proposing alignments parallel to such streams. 61 Fed.Reg. at 65,884. This language of the preamble can be viewed as a supplement to the requirement of NWP 12, however, the language does not suggest that parallel alignments are per se prohibited. Rather, it appears that the ACE added a preconstruction notification requirement ("PNC") to NWP 12 projects in which parallel alignments were proposed. *See* 61 Fed.Reg. at 65,885, 65,915. These PNC requirements indicate that the ACE's concern was not with parallel alignments themselves, but rather with parallel alignments that run through wetlands or other waters within the ACE's jurisdiction. *See* 61 Fed.Reg. at 65,915 (NWP 12 provision stating PNC required, among other things, when "[t]he utility line is placed within a jurisdictional area ... and it runs parallel to a streambed that is within the jurisdictional area"); *see also id.* at 65,884 (preamble discussion noting that it should be an "exceptional case" where NWP 12 could be applied to a utility line "within, or

---

**3.** Sidecasting "involves deposit of dredged or excavated material from a wetland back into that same wetland...." *U.S. v. Deaton,* 209 F.3d 331 (4th Cir.2000).

within wetlands parallel to, a stream bed for more than 100 feet").

In this case, the record is clear that, at most, the project would have an impact on 73 linear feet, well under the informal 100 linear feet threshold mentioned in the preamble language. *(See* AR 1, 8–10.) Therefore, even assuming that the preamble language has been incorporated into the requirements for NWP 12, the ACE decision that NWP 12 applied was not arbitrary and capricious.

*c) The ACE Appropriately Considered Water Quality Issues When It Verified the Permit*

Plaintiffs assert a number of arguments in support of their contention that the ACE did not give proper consideration to water quality issues, particularly concerning the East Canyon Pipeline project. But as discussed, these contentions are not supported by applicable law or by the administrative record.

Section 401(a) of the Clean Water Act generally requires that for activities that might result in discharges to waters subject to the Act, permit applicants must obtain certification from authorized states, such as Utah, that the discharge will comply with the requirements of the Clean Water Act. *See* 33 U.S.C. § 1341(a). Under section 404(b)(1) of the Act, all section 404 permits issued by ACE must comply with the EPA's 404(b)(1) Guidelines. *See* 40 C.F.R. Part 230 (codifying EPA's section 404(b)(1) Guidelines).

For NWPs requiring section 401 water quality certification, such as NWPs 26 and 12, such certification is generally sought from the affected states at the time that the NWP is first issued (in this case 1996). *See* 33 C.F.R. § 330.4(c); *see also generally* 61 Fed.Reg. at 65,887–88 (discussing this process). Under ACE requirements for all permits, "[c]ertification of compliance with applicable effluent standards required under provisions of section 401 of

the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator [of EPA] advises of other water quality aspects to be taken into consideration." 33 C.F.R. § 320.4(d). If a state has not granted water quality certification for a particular NWP, an individual permit will not automatically be required, but the ACE "may consider water quality, among other appropriate factors, in determining whether to exercise [its] *discretionary* authority and require a regional general permit or an individual permit." 33 C.F.R. § 320.4(c)(5)(emphasis added).

In this case, the record demonstrates that the State of Utah granted water quality certification for NWPs 12 and 26 at the time of their issuance in 1996. On June 21, 1999, however, the Utah Department of Water Quality ("DWQ") informed the ACE by letter that it intended to "withdraw or revoke" its section 401 certification as it applied to pipeline project. (AR 1043.) In this letter, the Utah DWQ noted that East Canyon Creek had been listed pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), as having "impaired" water quality, and that because of this fact and the "high" public interest in the project, the State felt that a full individual permit proceeding was appropriate. *Id.* In response to the position taken by the Utah DWQ, the EPA, on August 27, 1999 recommended that ACE exercise its discretion and require an individual permit. *(See* AR 755.) Importantly, however, the EPA did not state that 303(d) impairment status precluded NWP authorization, but recommended that the ACE's authorization of the project should "assure that further impairment or further contribution to the standards violation [sic] in the § 303(d) waterbody does not occur as a result of the activity covered by the permit. . . ." (AR 758.)

In response to both EPA and the Utah DWQ concerns, the projects proponents revised their plans for the projects. After reviewing the revised plans, and after receiving commitments from Davis & Weber Counties Canal Company and Summit Water Distribution Company to address DWQ's concerns about erosion control, the DWQ, on November 16, 1999, withdrew its earlier objection to the authorization of the project under a NWP and its intention to revoke its section 401 water quality certification. *(See* AR 64, 66–67.) In support of this decision, the DWQ noted the "substantial changes in the project, including moving the alignment more to the west and in less sensitive areas," and the "improvement in the explanation of and the methods for the treatment of disturbed areas." *Id.* at 64.

▬ When faced with water quality issues, the ACE can and must rely on the determination of the State DWQ to decide whether a proposed project meets the requirements of the Clean Water Act. States perform this function by "certifying" projects under section 401 of the Act. Under the ACE's regulations,

> [c]ertification of compliance with effluent limitations and water quality standards required under the provisions of section 401 of the Clean Water Act will be considered conclusive with respect to water quality aspects to be taken into consideration unless the Regional Administrator [of EPA] advises other water quality aspects to be taken into consideration.

33 C.F.R. § 320.4(d). If a State has not granted water quality certification to a particular NWP, an individual permit is not automatically required, but the ACE "*may* consider water quality, among other factors in determining whether to exercise [its] *discretionary* authority and require a

regional general permit or an individual permit." 33 C.F.R. § 330/(4)(c)(5) (emphasis added). As the highlighted language suggest, this allows the ACE to make its own determination. Therefore, even if a state did not "sign-off" on the project, the ACE could still decide to issue a NWP. However, in this case, although initially concerned, Utah DWQ did not withdraw its certification because it was satisfied with the final form of the project. This certification by DWQ is dispositive on the matter of water quality.

It is clear, then, that the ACE took reasonable and appropriate steps to address water quality issues associated with the authorization of the pipeline under NWP 12. Not only did the ACE coordinate with project proponents to ensure that the final proposed project met with the DWQ's approval, whose opinion, as discussed above, is generally treated as dispositive on water quality issues under ACE regulations, the record also demonstrates that ACE added additional conditional measures to the permit in order to preserve the integrity of water quality. *See id.*

*d) The ACE did not Improperly "Stack" NWPs for Two of the Projects*

Plaintiffs claim that the authorization of the East Canyon Pipeline under NWP 12 and the water treatment plant under NWP 26 is an example of improper "stacking"[4] of NWPs in violation of the CWA. Although Plaintiffs seemed to abandon this challenge in their reply brief, Plaintiffs also argued that ACE failed to meet its own requirement of conducting a "very critical review" before such stacking occurs.

There are three legal guidelines which guide ACE on the issue of stacking. First,

---

4. "Stacking" is a general term that refers to an illegal practice, in which a project requiring programmatic consideration is artificially split into smaller proposed projects for the purpose of evading onerous permit requirements.

the ACE's general NWP regulations expressly allow "[t]wo or more different NWPs [to be] combined to authorize a 'single and complete project,'" as long as the same NWP permit is not used more than once for the same project. 33 C.F.R. § 330.6(c). Second, as discussed above, NWP 26 allows combinations of NWP 26 and any other NWP, as long as the project as a whole will have three acres or less of impact. *See supra* Section C(1)(a); 61 Fed.Reg. at 65,917. Finally, General Condition 15 requires preconstruction notification to the ACE whenever NWPs 12 through 40 are combined as part of the same project, in order to allow ACE to assure that a given project, as a whole, will have no more than minimal environmental impacts. *See* 61 Fed.Reg. at 65,877, 65,-992.

■ In this case, because the pipeline and treatment plant are authorized under different NWPs, combination of the two is permitted under 33 C.F.R. § 330.6(c). Second, as discussed above, the record clearly demonstrates that the proposed projects will not result in more than three acres of adverse impacts. *See supra* Section 1(A). And finally, the ACE was given preconstruction notification by the proponents. The ACE determined that the projects presented no more than minimal environmental impacts. *See id.*

Plaintiffs also cite language from the non-binding preamble, rather than any of the NWP general regulations, for the proposition that the ACE generally instructs its district engineers to be on sharp lookout to ensure that projects that have more than minimal impacts do not proceed under combined permits. 61 Fed.Reg. at 65,877 ("With this notice we are directing all district engineers to conduct very critical reviews of projects involving stacking to ensure that no more than minimal ad-

verse impacts will occur."). Even assuming these preamble admonitions were a binding general condition of NWPs, the record, as discussed above, demonstrates that ACE ensured that no more than minimal impacts would occur from the projects. ACE, therefore, did not allow improperly "stacked" permits for the projects.

*e) The ACE Conducted an Appropriate Alternatives Analysis for the Challenged NWP Verifications*

Section 404(b)(1) guidelines of the Clean Water Act generally require an examination of practicable alternatives that have less adverse impacts on an aquatic ecosystem before issuing a section 404 permit. *See generally* 40 C.F.R. Part 230 (codifying 404(b)(1) Guidelines). Plaintiffs charge that the ACE did not properly conduct an "alternatives" analysis. Plaintiffs' argument is misplaced because the "alternatives" analysis cited by Plaintiffs applies to the *issuance* of permits, not to a subsequent verification of the applicability of a NWP.

■ EPA's 404(b)(1) Guidelines, upon which Plaintiffs' argument is based, expressly states that in the case of general permits, such as NWPs, the "analysis and documentation required by the Guidelines will be performed at the time of the general permit issuance...." 40 C.F.R. § 230.6(d). The ACE issued NWP 12 and 26 in 1996; at that time, the ACE considered the "alternatives" issue as well as related issues pertaining to the scope of review required under NEPA-as discussed below. *See* 61 Fed.Reg. at 65,878–79. The ACE concluded at the time that because NWPs, by definition, authorized only activities that caused minimal environmental impact, an "environmental assessment," as opposed to a more intensive "environmental impact statement," was sufficient for NEPA purposes." *Id.* at 65,879.[5] At the

---

5. Therefore, as discussed above and below, no

further NEPA evaluation (including "alterna-

time of first issuance, to address the alternatives issue, ACE "prepared a programmatic alternatives analysis for each NWP which discusses administrative alternatives to issuing each NWP." *Id.* Because the alternatives analysis was addressed when the NWPs at issue in this case were first formulated, there is no requirement that ACE conduct an alternatives analysis during NWP verifications. Therefore, Plaintiffs' claim that ACE acted arbitrarily and capriciously by failing to conduct a proper alternatives analysis fails because no alternatives analysis is necessary for NWP verifications.

*f) The ACE was not Arbitrary and Capricious and did not Abuse its Discretion when it Did not Require Individual Permits for the East Canyon Pipeline and the Water Treatment Plant*

 Plaintiffs' final Clean Water Act claim is that the ACE abused its discretion in not requiring individual permits for the projects, and that this violated the Act. Plaintiffs overlook, however, that the ACE's decision is discretionary. Therefore, if a state has not granted water quality certification to a particular NWP, an individual permit is not automatically required. However, the ACE "*may* consider water quality, among other factors in determining whether to exercise [its] *discretionary* authority and require a regional general permit or an individual permit." 33 C.F.R. § 330/(4)(c)(5) (emphasis added). In this case, as discussed above, the ACE has amply demonstrated that there are only minimal impacts associated with the projects. Further, it also ensured that there would be only minimal impacts as a result of conditions the ACE imposed on the project. *See supra,* Sections 1(C), 1(E). Plaintiffs have also not pointed to

specific evidence in the record that shows there would be more than minimal impacts-they rely, instead, on blanket assertion. Thus, Plaintiffs have not met their burden to demonstrate that ACE's discretionary judgment not to require individual permits was arbitrary and capricious.

In sum, for the reasons specified above, the ACE did not violate the Clean Water Act in allowing the projects to proceed under the NWP verification process, and Plaintiffs' Clean Water Act challenge to ACE's decision fails.

*2. National Environmental Protection Act*

 Plaintiffs' National Environmental Protection Act ("NEPA") claims depend on the propriety of the ACE's decision to verify permits pursuant to the NWP program. As discussed, issuing general permit verification under the NWP program is proper if the ACE determines that discharges of dredge and fill material "will cause only minimal adverse environmental effects ... and will have only minimal cumulative effects on the environment." 33 U.S.C. § 330.1(b). And, as discussed above, the ACE fully complied with NEPA when the ACE first decided to issue the type of NWPs of concern in this case. In the context of NWPs, the ACE performs the required NEPA analysis for the relevant class of activities at the time the ACE promulgates the NWPs in the *Federal Register. See e.g., Defenders Wildlife v. Ballard,* 73 F.Supp.2d 1094, 1109 (D.Ariz. 1999); *Bragg v. Robertson,* 54 F.Supp.2d 635, 650 (S.D.W.Va.1999); *Abenaki Nation of Mississquoi v. Hughes,* 805 F.Supp. 234, 237 (D.Vt.1992), *aff'd* 990 F.2d 729 (2d Cir.1993) (per curiam); *see also* 61 Fed.

tives" analysis) is required when a party begins operations under the authorization of a NWP. *See Bragg v. Robertson,* 54 F.Supp.2d 635, 650 (S.D.W.Va.1999); *Abenaki Nation of*

*Mississquoi v. Hughes,* 805 F.Supp. 234, 237 (D.Vt.1992), *aff'd* 990 F.2d 729 (2d Cir.1993) (per curiam).

Reg. at 65,874, 65,878, 65,921 (Dec. 13 1996) (outlining NEPA compliance discussion for the NWPs at issue in this case). Similarly, no further formal evaluation pursuant to 404(b)(1) is required at the time individual activities are undertaken pursuant to an NWP. See 40 C.F.R. § 230.6(d). As a result, because ACE conducted the requisite NEPA analysis when it first issued the NWPs of relevance to this case, it fully complied with NEPA, and Plaintiff's NEPA claims are therefore meritless.

### 3. National Historic Preservation Act

Plaintiffs argue that ACE violated the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.*, which, Plaintiffs contend, required the ACE to make an independent effort to make sure that no historic properties would be affected by the projects. Plaintiffs make this argument in spite of the fact that the appropriate State official (the Utah State Historic Preservation Office, or "SHPO") determined that the proposed East Canyon pipeline would *not* affect historic properties. *(See* AR 549.) Under NHPA, the State Historic Preservation Office is the key participant in the review process and is responsible for representing and preserving cultural resources in the State and assisting federal agencies in carrying out their review responsibilities. *See* 36 C.F.R. § 800.1(c)(1).

By its own regulations, the ACE is to consider whether a proposed project under the NWP may affect historic properties. *See* 33 C.F.R. § 325, App. C. In the case of NWPs, of course, the actual permits are often issued years before they are applied to any particular project, thereby making it difficult, if not impossible, to assess the potential historic property impact at any particular location at the time the permits are actually verified. ACE regulations, therefore, as well as similar provisions in General Condition 12 to the NWPs, estab-

lish procedures for addressing NHPA compliance in context of the NWPs. Both ACE regulations dealing with the subject require potential permittees to notify the ACE if a proposed NWP project may affect certain historic properties. *See* 33 C.F.R. § 330.4(g); 61 Fed.Reg. at 65,920 (General Condition 12). Once such a notification is provided, the ACE will not authorize the NWP until the ACE has completed a NHPA review to comply with Appendix C procedures-ACE regulations to consider whether a proposed project affects historic properties. *Id.; see also* 33 C.F.R. Part 325, App. C (Part 13). In the absence of such a notification, there is no requirement that ACE conduct such a review. Because any project that "may affect" historic properties is not authorized until the Appendix C process is completed, nationwide permittees risk violating the Clean Water Act if they proceed with a project under a NWP without adequately investigating NHPA issues. *See* 33 C.F.R. § 330.4(g). ACE regulations therefore encourage potential permittees to investigate their projects with the State Historic Preservation Office and the National Register of Historic Places, and to monitor the project for historic property impacts closely during construction. *See* 33 C.F.R. § 330.4(g)(3) & (4); *see also Sierra Club v. Slater,* 120 F.3d 623, 636 (6th Cir.1997)(noting same).

■ The record demonstrates that the ACE fully complied with the National Historic Preservation Act. In compliance with 33 C.F.R. § 330.4(g) and General Condition 12, Davis & Weber Counties Canal Company, the permit applicant, whose activities are charged to be in violation of the National Historic Preservation Act, investigated the potential impact of the East Canyon Pipeline on historic properties, and reported its finding to ACE with its application material for the pipeline. *(See*

AR 88.) Davis & Weber Counties Canal Company reported that while the project area contained a number of potential historic resources, the Utah State Historical Preservation Office-the SHPO for the project-had been contacted and had determined that the proposed route for the pipeline "would not affect any of the known historical or cultural resources in the area. . . ." *Id.* Davis & Weber Counties Canal Company included a copy of the reference letter from the State Historic Preservation Office, which was issued on November 10, 1998.

Therefore, the ACE did all that was required to investigate potential National Historic Preservation Act issues related to the NWP verification. The ACE had no obligation, because of the State Historic Preservation Office's finding, to conduct any further NHPA review of the project pursuant to 33 C.F.R. Part 325, App. C, because there was no "may affect" finding to trigger such review. *See* 33 C.F.R. § 330.4(g)(2). Accordingly, Plaintiffs' contention that ACE acted arbitrarily and capriciously with regard to its National Historic Preservation Act responsibilities is without merit.

### 4. Federal Wildlife Coordination Act

 Plaintiffs' claim raised under the Federal Wildlife Coordination Act ("FWCA") rests on the fact that the United State Fish and Wildlife Service ("FWS") and the Utah Department of Wildlife Resources ("DWR") raised concerns early on in the project. As a threshold matter, it must be noted that it is well settled that the Federal Wildlife Coordination Act provides no private right of action for citizen suits. *See, e.g., Texas Committee on Natural Resources v. Marsh,* 736 F.2d 262, 268 (5th Cir.1984); *Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848, 853 (9th Cir.1979); *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346, 356 (8th Cir.1972). However, Plain-

tiffs may challenge the ACE's degree of coordination under the Federal Wildlife Coordination Act as arbitrary and capricious under the Administrative procedures Act, and the court will consider Plaintiffs' challenge to the ACE's actions accordingly. *See Sierra Club,* 935 F.Supp. at 1579.

Under the Federal Wildlife Coordination Act, before verification, any project which would cause the

> waters of any stream or other body of water . . . to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with *the head of the agency exercising administration over the wildlife resources of the particular state . . . .*

16 U.S.C. § 662(a) (emphasis added). ACE's governing regulations recognize these responsibilities under the FWCA. *See* 33 C.F.R. § 222.5(f)(1). These requirements, of course, are procedural, not substantive. Moreover, the ACE is allowed to rely on information supplied by the proponent of a project or the proponent's consultant. *See, e.g., Friends of the Earth v. Hintz,* 800 F.2d 822, 834–35 (9th Cir.1986). However, the FWCA requires that reports and recommendations by the Fish and Wildlife Service and like agencies be given "serious consideration." *County of Bergen v. Dole,* 620 F.Supp. 1009, 1063 (D.N.J.1985). The ACE's own regulations also state that the ACE has an obligation to give "full consideration" to the concerns of other agencies. 33 C.F.R. § 320.4(c). There is no legal standard defining the appropriate scope of "consideration" merit-

ed; however, it is clear that the record must reflect that such consideration was part of ACE's evaluation and verification process.

 In this case, both the Fish and Wildlife Service and the Department of Wildlife Resources commented on the possible effects of the pipeline on wildlife. *(See generally* AR 774–75, 1055–56, 1521–26.) With respect to the State, an agreement between Department of Wildlife Resources and the project applicant sets the requirements that the State believed were necessary to protect wildlife resources. *See id.* at 1528–36. This agreement demonstrates that the State was consulted and involved in determining how to structure the project so as to limit effects on wildlife. Similarly the Fish and Wildlife Service was involved with the review of the permit verification in this case. Initially, the Fish and Wildlife Service stated that it had no concerns with the project, under the FWCA, and that it had no objection to the permit application. *See id.* at 1521–23. Later, the Fish and Wildlife Service determined that it did have some concerns about wildlife impacts; however, these concerns were considered and addressed by the project sponsor and are reflected in the environmental assessment accompanying the pipeline application. *See id.* at 87–88, 90.

Accordingly, the ACE surely did not act arbitrarily and capriciously with respect to its responsibilities under the Federal Wildlife Coordination Act.

### *Order*

For the reasons set for above, Plaintiffs' Appeal and Motion to Remand Agency Action are DENIED, and JUDGMENT is GRANTED for Defendants.